UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                    S2 24 Cr. 91 (GHW)

ANDREY KOSTIN,
 a/k/a "Andrei Kostin,"
VADIM WOLFSON,
 a/k/a "Vadim Belyaev," and
GANNON BOND,

                    Defendants.


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT VADIM WOLFSON'S MOTION FOR A RULE 15 DEPOSITION**


                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York
                              26 Federal Plaza, 37th Floor
                              New York, New York 10007


Emily Deininger
David R. Felton
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

DISCUSSION ............................................................................................................... 3

   I.   Applicable Legal Standards Under Rule 15 ............................................................ 3

ARGUMENT ................................................................................................................. 7

   I.   The Government Does Not Dispute That Skittides Is Unavailable for Trial.................... 7

   II.  Wolfson Fails to Meet His Burden ..................................................................... 7

      A.   The Anticipated Testimony Does Not Satisfy Rule 15 ............................... 7

          1.   The Proposed Testimony Would Be Inadmissible, Immaterial as to Wolfson's Factual Innocence, and Would Not Meet the Rule 15 Standard ........................................ 8

          2.   The Proposed Testimony Has No Connection to Wolfson, and Therefore Would Be Immaterial to Wolfson's State of Mind ........................................................ 13

      B.   A Rule 15 Deposition Would Not Be In the Interest of Justice ................................ 15

          1.   The Rule 15 Deposition of Skittides Would Be Unreliable.................................... 15

          2.   Reliable Procedures Are Uncertain and the Deposition Likely Would Cause Meaningful Delay ............................................................................................ 16

          3.   The Testimony Is Unlikely to Be Admissible.......................................... 19

          4.   If the Testimony Is Permitted to Proceed, the Court Should Order Certain Disclosures ...................................................................................................... 20

   CONCLUSION.................................................................................................... 22

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion of defendant Vadim Wolfson (the "defendant") to take a pretrial deposition of Irina Skittides in Limassol, Cyprus pursuant to Rule 15 of the Federal Rules of Criminal Procedure. For the reasons set forth below, Wolfson's motion should be denied in its entirety.

As alleged in the Indictment, Wolfson participated in a scheme to violate the International Emergency Economic Powers Act ("IEEPA") by providing funds and services to and for the benefit of co-defendant Andrey Kostin, a Russian oligarch who was sanctioned by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") on April 6, 2018. (Dkt. 1 ¶ 1). Kostin, who has been the President of Chairman of Russian state-owned VTB Bank since 2002, used shell companies and nominee owners for many of his assets, including a home in Aspen, Colorado (the "Aspen Home"), that he purchased in 2010. (*Id.* ¶¶ 2, 5). CC-1 and CC-3 are both close associates of Kostin who served as nominal owners of shell entities for Kostin assets and assisted Kostin with the management of those shell companies and assets. (*Id.* ¶¶ 8, 10).

In or about 2014, nominal ownership of the Aspen Home was transferred to a new shell company, Altamonte Holding Limited ("Altamonte"). (*Id.* ¶ 42). While Wolfson was, indirectly, the nominal owner of Altamonte, Kostin remained the true beneficial owner of the Aspen Home. (*Id.* ¶ 35). A shell entity controlled by Kostin, Capital Business Finance, provided the financing for Altamonte's purchase of the Aspen Home in the form of a $10 million loan, and Capital Business Finance or its subsidiary, CapitalInvest, regularly funded the bank account used by Altamonte to operate the Aspen Home. (*Id.* ¶¶ 43, 45). Capital Business Finance and CapitalInvest were owned and controlled, through various other shell companies and intermediaries, by CC-1 and CC-3 on behalf of Kostin. (*Id.* ¶ 44). Moreover, Kostin continued his use and control of the Aspen Home, with other visits coming to the property only as his guests. (*Id.* ¶ 39).

After Kostin was sanction in April 2018, and through at least September 2019, co-defendants Wolfson and Gannon Bond operated and maintained the Aspen Home—which was, at that point in time, blocked property—thereby providing a benefit to Kostin. (*Id.* ¶ 47). In or about September 2019, Wolfson purchased the Aspen Home from Kostin by causing approximately $12 million to be transferred to CapitalInvest (the "2019 Transaction"). (*Id.* ¶ 48).

Rule 15 depositions sought by a defendant without the Government's consent are only permitted in "exceptional circumstances" where the proposed testimony is not merely relevant, but would exculpate the defendant. Fed. R. Crim. P. 15(a)(1). Here, Wolfson has fallen far short of establishing that the testimony he expects to elicit would be exculpatory, or even admissible. The principal testimony Wolfson seeks from Skittides pertains to Skittides's purported lack of knowledge that CC-3 acted as a nominee for Kostin. Wolfson does not proffer, however, that Skittides will provide any specific testimony regarding the transactions or entities that are central to the charged offenses, and her testimony is completely unconnected from any contemporaneous knowledge of Wolfson or Bond, whom she did not know. It therefore has minimal, if any, relevance to the Government's pertinent allegations: namely, that Wolfson improperly provided benefits to Kostin by helping Kostin, post-sanctions, to operate and maintain the Aspen Home and, in or about September 2019, transferred approximately $12 million to CapitalInvest—a shell entity controlled by Kostin that was nominally owned, on paper, by CC-1 and CC-3—in connection with the 2019 Transaction. Accordingly, the testimony does not meet the high bar required for a Rule 15 deposition.

Moreover, the proposed pretrial depositions must be "in the interest of justice." Fed. R. Crim. P. 15(a)(1). Here, the proposed deposition does not meet that standard because, *inter alia*: (i) Skittides would be unlikely to face any sanction for untruthful testimony; (ii) the deposition is

2

unlikely to result in admissible evidence that could be used at trial; and (iii) the deposition would likely cause meaningful delay both because of the time it will take the letters rogatory to work through the legal process in Cyprus and due to the subsequent litigation over what, if any, of the testimony is admissible.  For these reasons, and those discussed in greater detail below, the defendant's Rule 15 motion should be denied.

## DISCUSSION

### I.    Applicable Legal Standards Under Rule 15

Federal Rule of Criminal Procedure 15 allows for pretrial depositions in criminal cases in "exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  The Rule requires that such a "deposition must be taken and filed in the same manner as a deposition in a civil action" and that the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial."  Fed. R. Crim. P. 15(e).  With respect to depositions proposed to be taken outside the United States, "more than one court has observed that 'foreign depositions are suspect and, consequently, not favored.'"  *United States v. Oudovenko*, No. 00 Cr. 1014 (JG), 2001 WL 253027, at *3 (E.D.N.Y. Mar. 7, 2001) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1551 (11th Cir. 1993)).  Among other reasons, this is "because the factfinder does not have an opportunity to observe the witness' demeanor," *United States v. Milian-Rodriguez*, 828 F.2d 679, 686 (11th Cir. 1987), because such depositions taken abroad "lack[] the sanction of perjury," *United States v. Feijoo-Tomala*, 751 F. Supp. 40, 43 (E.D.N.Y. 1990), and "the use of different procedures related to, *inter alia*, the oath, the translation process, and the opportunity for cross-examination," *Oudovenko*, 2001 WL 253027, at *3; *see also United States v. Salim*, 855 F.2d 944, 950 (2d Cir. 1988) (expressing "considerable concern about the possible abuses of foreign methods of examining witnesses").

The burden is on the party seeking a Rule 15 deposition—here, Wolfson—to establish that exceptional circumstances exist, and that injustice will result if the motion is denied. *See United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962); *see also United States v. Kelley*, 36 F.3d 1118, 1124 (D.C. Cir. 1994). Specifically, "[a] movant must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001); *see also United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).

Rule 15 provides "that the district court retains broad discretion in granting a Rule 15(a) motion and that the court should review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute 'exceptional circumstances.'" *United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994). Exceptional circumstances are by definition extraordinarily rare, *i.e.*, "occur very, very rarely and would strike someone as remarkable or astounding." *Matter of Grand Jury Proceedings [Redacted]*, 377 F. Supp. 3d 439, 444 n.5 (D. Del. 2018); *see also Dillman*, 15 F.3d at 389 ("The words 'exceptional circumstances' bespeak that only in extraordinary cases will depositions be compelled."); *United States v. Rosen,* No. 05 Cr. 225, 2006 WL 5029996, at *1 (E.D. Va. Apr. 21, 2006) ("Rule 15(a) depositions are appropriately granted only in rare circumstances.").

With respect to witness availability, the movant must establish that he made a "good-faith effort to produce the person to testify at trial." *Johnpoll*, 739 F.2d at 709. This means that the moving party must establish that the foreign-based witness is truly unable or unwilling to come to the United States to testify. A defense counsel's representation that a witness would not voluntarily travel to the United States to testify at the trial, without more, is insufficient to satisfy this requirement. *See Oudovenko*, 2001 WL 253027, at *2; *see also United States v. Chusid*, No. 00

4

Cr. 0263 (LAK), 2000 WL 1449873, at *1 (S.D.N.Y. Sept. 27, 2000) ("Conclusory statements of unavailability by counsel are insufficient" to meet a movant's burden.); *Whiting*, 308 F.2d at 541 ("Neither the motion nor the supplementary affidavit . . . did more than allege, in conclusory terms, the availability of the five proposed witnesses."); *United States v. Vilar*, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) (suggesting that repeated contact and offers to pay all expenses of the witnesses would meet good faith requirement).

Rule 15 requires that the testimony that is sought relates to material issues.  Evidence is "material" for purposes of Rule 15 "if it is 'highly relevant to a central issue in the case.'"  *United States v. Grossman*, No. 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005) (quoting *Drogoul*, 1 F.3d at 1556); *see also United States v. Abu Ghayth*, S14 No. 98 Cr. 1023 (LAK), 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014) (proposed Rule 15 testimony "should be more than merely relevant"); *Dillman,* 15 F.3d at 389 ("[I]t is emphatically clear to us that the words 'in the interest of justice' call for the deposition to offer evidence that is material.").  This requires "some showing, beyond unsubstantiated speculation," that the testimony sought in the Rule 15 deposition "exculpates the defendant."  *Kelley*, 36 F.3d at 1125 (affirming denial of depositions where anticipated testimony, although relevant, was not exculpatory) (internal quotation marks and citation omitted); *see also United States v. Merritt*, No. 90 Cr. 767 (JSM), 1991 WL 79235, at *5 (S.D.N.Y. May 7, 1991) (denying Rule 15 deposition request where "the defendants have made no showing that the deponents' testimony would be exculpatory"); *United States v. Esquivel*, 755 F. Supp. 434, 439 (D.D.C. 1990) ("[A] defendant typically demonstrates the 'exceptional circumstances' necessary for success on a Rule 15(a) motion by some preliminary showing that the testimony will exculpate him." (citations omitted)).

In sum, the moving party must do more than merely show that the testimony sought is relevant to the case.  *United States v. Ismaili*, 828 F.2d 153, 161 & n.6 (3d Cir. 1987) (holding that a district court cannot abuse its discretion in denying a Rule 15 deposition where the testimony "could not negate the crux of the government's indictment"); *Dillman*, 15 F.3d at 389 (finding no abuse of discretion where the testimony would not have exculpated the defendants); *Abu Ghayth*, 2014 WL 144653, at *2 ("[T]he proposed testimony must be admissible and non-cumulative of other evidence.").

In addition to requiring showings of both unavailability and materiality, a district court must also consider whether significant "countervailing factors" exist which would render the taking of depositions unjust.  *Drogoul*, 1 F.3d at 1552.  Such countervailing factors include, among other things, whether: (i) the deposition will "expedite, rather than delay, the administration of criminal justice," *id*. at 1556 (quoting Fed. R. Crim. P. 15, Advisory Committee's Note, 1974 amendment); (ii) "the likelihood that the procured testimony will be admissible at trial," *United States v. Jefferson*, 594 F. Supp. 2d 655, 665 (E.D. Va. 2009); and (iii) the incentives for truthful testimony.  *See United States v. Banki*, No. 10 Cr. 08 (JFK), 2010 WL 1063453, at *2 (S.D.N.Y. Mar. 23, 2010); *United* States v. *Buck*, 271 F. Supp. 3d 619, 624 (S.D.N.Y. 2017).  Even if the sought-after evidence is material, "a court may properly deny the motion if the proposed testimony would be cumulative or consists of hearsay."  *Grossman*, 2005 WL 486735, at *3 (citing *United States v. Dunseath*, No. 98 Cr. 493 (JGK), 1999 WL 165703, at *1 (S.D.N.Y. Mar. 25, 1999) and *United States v. Campbell*, No. 91 Cr. 1219 (RJD), 1998 WL 564376, at *1 (E.D.N.Y. June 30, 1998)); *see also United States v. Stein*, 482 F. Supp. 2d 360, 365 (S.D.N.Y. 2007).  This is because "[t]he court need not, at the cost of time and money, engage in an act of futility by authorizing depositions that clearly will be inadmissible at trial."  *Drogoul*, 1 F.3d at 1555.

## ARGUMENT

### I.    The Government Does Not Dispute That Skittides Is Unavailable for Trial

The Government does not dispute, for purposes of this motion, that Skittides resides beyond the subpoena power of this Court and will rely in good faith on the assertions in the Rybicki Declaration that she is unwilling to travel to the United States to testify but is willing to subject herself voluntarily to a deposition in Cyprus. (*See* Rybicki Decl. ¶¶ 7, 9). The Government thus does not dispute that Skittides is unavailable for trial.

### II.    Wolfson Fails to Meet His Burden

Wolfson's motion fails for multiple reasons. First, Wolfson's motion fails to identify any admissible and exculpatory evidence that Skittides could—or would—reasonably be expected to supply as part of a Rule 15 deposition. Second, the deposition envisioned by Wolfson would effectively allow Skittides to testify on his behalf without the assurance of reliability afforded by domestic testimony of a sworn witness subject to cross-examination. And third, notwithstanding Wolfson's desire that a deposition in Cyprus be arranged for the week of January 20, 2025, in light of the Government's understanding of Cyprus's legal process, a Rule 15 deposition requested through letters rogatory is likely to cause meaningful delay both in terms of the process to secure testimony—to the extent it is even possible—and in subsequent litigation regarding what, if any, of the testimony is admissible.

#### A.    The Anticipated Testimony Does Not Satisfy Rule 15

As a threshold matter, to satisfy the high barrier of Rule 15, a movant "must" proffer sufficient facts "to alert the district court to the substance of the evidence that is at peril of being excluded," *United States v. Ramos*, 45 F.3d 1519, 1523 (11th Cir. 1995), and there must be a showing that "the evidence would enable the defendant to alter the quantum of proof significantly

7

in her favor," *United States v. Lafontaine*, No. 98 Cr. 251 (MBM), 2000 WL 890380, at *2 (S.D.N.Y. July 5, 2000). Moreover, it is not enough for counsel simply to propound a generalized expectation of what testimony a proffered witness might provide. *See Chusid*, 2000 WL 1449873, at *2 ("[D]efense counsel has given the Court only their expectations as to what these witnesses would say if examined. They have not submitted affidavits from the witnesses. Indeed, they have not even suggested that they sought but were unable to obtain affidavits."). However, that is precisely what Wolfson has done here, and in so doing, he has failed to demonstrate that the testimony he seeks to elicit is "highly relevant" and "exculpatory," as required by Rule 15.

Wolfson's motion is premised on his general expectations of the testimony that Skittides would provide, based on (i) statements Skittides made during a March 2024 video interview with the Government, and (ii) defense counsel's proffer as to anticipated testimony based on a September 2024 meeting with Skittides. (*See* Wolfson Br., Rybicki Decl. ¶ 8). Even if Skittides were to satisfy Wolfson's general expectations of such testimony, as discussed below, none of the expected statements is properly admissible and relevant to the proper issues for the jury, much less can negate the "crux of the government's indictment." *Ismaili*, 828 F.2d at 161 & n.6; *Feijoo-Tomala*, 751 F. Supp. at 45. Thus, there is no reason to believe that a deposition of Skittides would elicit testimony that would satisfy the high bar of Rule 15.

1. *The Proposed Testimony Would Be Inadmissible, Immaterial as to Wolfson's Factual Innocence, and Would Not Meet the Rule 15 Standard*

Wolfson's claim that Skittides testimony will demonstrate Wolfson's "factual innocence" by establishing "the absence of a benefit to Mr. Kostin from the 2019 Transaction" (Wolfson Br. 6) is unsupported by either the Federal Bureau of Investigation report of Skittides's interview or the limited attorney proffer Wolfson appends to his motion in support. As Wolfson acknowledges, "Skittides cannot definitively testify to who benefited from the 2019 Transaction." (Wolfson Br.

8

7).  But more than that, Wolfson does not proffer that Skittides will be able to provide *any* specific

testimony regarding the 2019 Transaction, the entities involved in the 2019 Transaction, or the

Aspen House.  Although Skittides will purportedly testify that she conducted "legal work" for CC-

3 (Rybicki Decl. ¶ 8(b)),[1] there is no proffer of any specific testimony Skittides will provide

regarding CapitalInvest, CapitalInvest's parent company, the ultimate beneficial ownership of

those entities, the relevant transactions, including the 2019 Transaction, or purported "legitimate"

explanations for those transactions.  (*See* Rybicki Decl. ¶ 8; *see also id.* Ex. A █████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[1] ████████████████████████████████████████████████████████  One significant issue that Wolfson fails to address in his motion is whether, if
at all, Skittides will answer questions regarding the substance of her interactions with CC-3 or will
assert attorney-client privilege.  For example, it is unclear if Skittides will answer questions
regarding specific business or transactions conducted with or on behalf of CC-3 or the relevant
entities.  These myriad privilege issues may significantly hinder the Government's ability to
effectively cross-examine Skittides and are another countervailing reason weighing against
authorizing the Rule 15 deposition.  The defense should not be permitted to elicit testimony
regarding Skittides's experience in conducting purported legitimate business conducted for CC-3
if the Government is not able to cross-examine Skittides regarding the detail of those interactions
and business dealings.  *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A
defendant may not use the privilege to prejudice his opponent's case or to disclose some selected
communications for self-serving purposes.").

To the extent that Skittides's testimony would be based on anything besides work that
Skittides did at the Tsirides Law Firm for CC-3, Wolfson has proffered no details as to what that
would be.

Skittides's proposed testimony about what she did for CC-3 is therefore of questionable, if any, relevance.[2]

In fact, the attorney proffer as to Skittides's proposed testimony only describes generalities that not only fail to undercut the crux of the charges, but appear to be based almost entirely on hearsay or that would otherwise be inadmissible. Wolfson first claims that Skittides will say that she "never knew or observed of any connection between CC-3 and Kostin." (Rybicki Decl. ¶ 8(a)). As an initial matter, this is plainly false, as Skittides has already described being aware of a significant connection between CC-3 and Kostin. Specifically, ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████. This evidence, which shows that CC-3 worked for, and closely with, Kostin is far from exculpatory.

To the extent Skittides's proposed testimony regarding a lack of connection between CC-3 and Kostin would be based not on her own personal observations—which, as discussed above, demonstrate that she was in fact well aware of a connection—but rather is premised on her review of unspecified "voluminous records" (Rybicki Decl. ¶ 8(b)), that testimony likely would constitute inadmissible hearsay. *See* Fed. R. Evid. 805 (setting forth the requirement that each part of combined statements constituting hearsay within hearsay must conform "with an exception to the

---

[2] For this reason, too, *United States v. Wey*, No. 15 Cr.611 (AJN), 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017), upon which Wolfson heavily relies, is easily distinguishable. In those "unusual circumstances," the Court granted a defendant's request to take a Rule 15 deposition of a witness who was expected to provide testimony regarding the defendant's involvement with, and the purposes for, specific transactions and entities. No such testimony has been proffered for Skittides.

rule"); *see also, e.g.*, *U.S. v. Ruffin*, 575 F.2d 346, 357 (2d Cir. 1977); *Pitre v. City of New York*, 713 F.Supp.3d 13, 27 n. 8 (S.D.N.Y. 2024) (witness "would not have been permitted to testify to what he saw in documents that were not in evidence, as these would have been hearsay"); *Weaver v. Warrington*, 2019 WL 13247286, at *6 (E.D.N.Y. Apr. 1, 2019) ("statement of . . . attorney as to the contents of a public record, offered for the truth of the matter asserted, is inadmissible hearsay").  The fact that Skittides's testimony would characterize the content of communications and documents does not make the testimony less objectionable, only more, and the issue is only further compounded by the fact that the Government does not have those records for purposes of cross-examination and impeachment.

Even assuming Skittides would and could properly testify that she saw no explicit reference to the fact that CC-3 was a nominee for Kostin in documents, that testimony is unhelpful to the defense.  That Kostin's true beneficial ownership of CapitalInvest—and CC-3's role as his nominee—are not documented is consistent with the Government's theory that CC-3 served as a straw owner for purposes of *concealing* Kostin's true ownership.  Indeed, the Government expects to introduce business records establishing that CC-1 and CC-3 were, at least on paper, the nominal owners of CapitalInvest and its parent company.  Thus, even if Skittides were to testify that she saw documents identifying CC-3 as the owner of CapitalInvest's parent company, such testimony would have little, if any, exculpatory significance.

The vast majority of the remainder of Skittides's proposed testimony, including that CC-3 "used legitimate service providers," "was an independently wealthy businesswoman," had "business activities including extending loans to individuals like Wolfson," and that "sophisticated parties . . . conducted due diligence on CC-3," (Rybicki Decl. ¶¶ 8(d)-(g)), cannot not form a basis for a Rule 15 deposition for much the same reasons.  First, there is no proffer as to personal

observations made by Skittides regarding any of those matters.  Rather, it appears that her knowledge is based on her review of the previously discussed records and communications.  That testimony would therefore also constitute inadmissible hearsay.  Second, this testimony is inadmissible because evidence that CC-3 generally engaged in legal activities is simply irrelevant to the issue of her role in the charged conduct.  *See, e.g.*, *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)); *United States v. Walker*, 191 F.2d 326, 336 (2d Cir. 1999); *United States v. Boykoff*, 68 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.").  Third, most of this testimony is untethered to the specific allegations in the indictment and, most critically, the identity of the true beneficial owner of the Aspen House and/or CapitalInvest.[3]

Wolfson also proffers that Skittides will testify that, "based on the nature of Ms. Skittides's relationship with CC-3," she would have "expect[ed] to know" if CC-3 were a nominee for Kostin.  (Rybicki Decl. ¶ 8(c)).  Skittides's opinion or expectation, however, is mere speculation or, at best, improper lay opinion that would usurp the jury's role to draw inferences from the objective facts of the case.  Nor does Wolfson provide any details or relevant foundation as to what would make that testimony admissible.  *See, e.g., United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), Dkt. 1490 at 10 (S.D.N.Y. Feb. 18, 2014) ("Testimony that [the proposed witness] was aware of

---

[3] There is an additional relevance issue as to Skittides's proffered testimony regarding due diligence conducted by third-parties of CC-3.  In particular, Wolfson does not specify what Skittides's testimony will be as to *when* that due diligence was conducted.  (Rybicki Decl. ¶ 8(g)). To the extent the due diligence occurred before CC-3 was sanctioned in 2023 (which presumably it was, as Wolfson proffers that Skittides will testify that her relationship with CC-3 ended in 2022), and before Kostin was sanctioned in 2018, the fact that "transactions were allowed to proceed following sanctions screening," (Rybicki Decl. ¶ 8(f)), has no bearing on any relevant issue.

legitimate, non-criminal activities of the [defendant's organization] and unaware of any criminal activities in which the [defendant's organization] or [the defendant] participated is not exculpatory absent some reason to believe that [the proposed witness] would or should have known both the organization's facial or public nature and, to the extent it had one, its secret nature.").

Finally, Wolfson argues that Skittides will testify that CC-3 "had a reputation in the Cypriot community as a legitimate businesswoman." (Rybicki Decl. ¶ 8(e)). Wolfson does not identify any rule of evidence that would provide for the admissibility of this improper character evidence, nor is the Government aware of any. *See* Federal Rules of Evidence 404, 607, 608, & 609. For all these reasons, the proposed testimony does not meet the Rule 15 standard. *See, e.g.*, *Merritt*, 1991 WL 79235, at *5; *Kelley*, 36 F.3d at 1125.

> 2. *The Proposed Testimony Has No Connection to Wolfson, and Therefore Would Be Immaterial to Wolfson's State of Mind*

Wolfson also claims that Skittides's proffered testimony that CC-3 "ran what appeared to sophisticated parties to be independent legitimate businesses" is "highly material to [] Wolfson's lack of *mens rea*." (Wolfson Br. 6). He is wrong. Even assuming Skittides would testify as proffered on this point, this evidence is relevant only to Skittides's *mens rea*, not Wolfson's. Critically, there is no proffer that Wolfson was involved in, or aware of, any of the referenced due diligence, business transactions, or any other dealings between Skittides and CC-3. Absent some evidence that Wolfson knew about the due diligence or any of the other aspects of CC-3's business that Skittides would testify had indicia of legitimacy, this evidence plainly has no relevance to Wolfson's state of mind. Skittides does not, and cannot, provide that link. Indeed, as noted above,

████████████████████████████████████████████████ Accordingly, this evidence is wholly irrelevant to Wolfson's *mens rea*. *See, e.g.*, *United States v. Avenatti*, S1 19 Cr. 373 (PGG), 2021 WL 2809919, at *32 (S.D.N.Y. July 6, 2021) (upholding the exclusion of evidence about

which the defendant was not aware because such evidence could not be relevant to the defendant's state of mind), *aff'd*, 81 F.4th 171 (2d Cir. 2023); *In re Escallón*, 323 F. Supp. 3d 552, 559 (S.D.N.Y. 2018) ("It is unclear how documents of which Petitioner had no knowledge could possibly bear on his mental state."); *United States v. Abdallah*, 911 F.3d 201, 220 (4th Cir. 2018) (explaining that evidence of a witness's belief or understanding, "absent some showing that the defendant relied on the witness['s] belief," was "merely a distraction" with "no relevance"). Wolfson has therefore made no showing that the deponents' testimony would be material, let alone exculpatory. *See Merritt*, 1991 WL 79235, at *5; *see also Cohen*, 260 F.3d at 78 (denying Rule 15 motion where the testimony would be irrelevant to the question of the defendant's guilt under the relevant statute).

Moreover, to the extent that Wolfson seeks to introduce evidence that he understood CC-3 to be an independently wealthy businesswomen, or to have engaged in other, legitimate business transactions, the proposed testimony from Skittides would be cumulative. Wolfson can call any number of other witnesses, including himself, to testify to his participation in and basis of knowledge for the relevant information. For that reason too, the motion should be denied. *See United States v. Wilson*, 11 F.3d 346, 354 (2d Cir. 1993) (witness testimony "would be cumulative, given that [the defendant] could have called any number of witnesses, including himself," to provide the same testimony); *United States v. Gragg*, 145 F.3d 1334 (6th Cir. 1998) (affirming denial of Rule 15 motions because "[t]he depositions would have been cumulative in light of the fact that Gragg himself testified to his state of mind"); *United States v. Hajbeh*, 284 F. Supp. 2d 380, 385 (E.D. Va. 2003) (denying Rule 15 motion where testimony "is also, at best, cumulative and merely corroborative of testimony that defendant himself is able to offer and hence not material").

14

In sum, because none of the lines of questioning proposed by Wolfson is likely to elicit any "fact that is of consequence in determining the action," Fed. R. Evid. 401, let alone admissible testimony that is "highly relevant to a central issue in the case," *see Grossman*, 2005 WL 486735, at *3, or that "negate[s] the crux of the government's indictment," *Ismaili*, 828 F.2d at 161 & n.6, Wolfson has failed to meet Rule 15 standard, and his motion should be denied. *See Esquivel*, 755 F. Supp. at 439-440; *United States v. Pham*, 12 Cr. 423 (AJN), 2015 WL 7871348, at *3-4 (S.D.N.Y. Dec. 4, 2015) (denying Rule 15 motion where testimony was not "highly relevant to a central issue in the case").[4]

### B. A Rule 15 Deposition Would Not Be In the Interest of Justice

Even if Wolfson were able to show that Skittides is likely to offer material, exculpatory evidence at trial—which he cannot—Wolfson's motion should nevertheless be denied because granting the motion would not further the interest of justice. *See* Fed. R. Crim. P. 15(a)(1).

#### 1. *The Rule 15 Deposition of Skittides Would Be Unreliable*

Wolfson seeks an unusual departure from the normal presentation of evidence at trial—through live testimony given under penalty of perjury and subject to the direct scrutiny of the jury.

---

[4] Wolfson argues that it is "only fair" that he be permitted to use the above-discussed evidence if the Government at trial introduces evidence regarding the relationship between CC-3 and Kostin. (Wolfson Br. 7). The issue, however, is not one of fairness, but simple application of the Federal Rules of Evidence. The Government anticipates that it will introduce witness testimony from individuals who observed interactions between Kostin and CC-3, and business records and co-conspirator statements showing that CC-3 was entrusted with managing various assets for Kostin and was the nominal owner of multiple shell entities controlled by Kostin. The fact that the Government may introduce such properly admissible evidence does not open the door for Wolfson to admit evidence that does not fall within the evidentiary rules.

Wolfson's assertion that "the government has refused to share details related to the nature of its proof" (Wolfson Br. 2 n.3), is even further off-base. The relevant materials are included in the Government's Rule 16 productions, the Government exceeded its discovery obligations by producing 3500 materials with its initial productions, and the Government provided a detailed reverse proffer regarding much of its evidence to defense counsel in September 2024.

Allowing Skittides to testify via a Rule 15 deposition would undermine the truth-seeking function of a jury trial.  If permitted to testify remotely from Cyprus, Skittides would not appear before a jury and would face no meaningful consequences for false testimony offered in a United States proceeding or otherwise refusing to comply with trial procedures (such as refusing to answer questions on cross-examination, assuming cross-examination is even permitted, as discussed below).  For example, the Court would not have the ability to hold Skittides in contempt, if necessary, as she would not be within the territorial reach of the Court and the U.S. Marshals.

In essence, this limitation would transform what would otherwise be sworn witness testimony before the jury into a one-sided license to commit perjury: "Without the teeth of the penalty of perjury, the oath becomes nothing more than an empty recital."  *See Buck*, 271 F. Supp. 3d at 624 ("[T]hese [Swiss] witnesses' testimony may essentially be free of any penalty of perjury, calling into doubt the reliability of any of the potential testimony.").  This risk is particularly acute in this case; given that Skittides apparently is unwilling to travel to the United States for trial despite having done so on multiple occasions in the past decade, and has a strong incentive to distance herself from the allegations in the Indictment, there is nothing to suggest that she would offer reliable testimony that is material to any issue to be decided at trial.  Indeed, safely beyond any meaningful reach of this Court, Skittides would be "essentially free to say anything without reprisal," substantially diminishing the reliability of any testimony she might provide.  *See Banki*, 2010 WL 1063453, at *3.

2. *Reliable Procedures Are Uncertain and the Deposition Likely Would Cause Meaningful Delay*

In addition to the risk of eliciting unreliable testimony from a deponent who may not testify truthfully, the testimony Wolfson seeks is likely to be even less reliable due to the uncertain procedures that would be utilized to procure Skittides's testimony in Cyprus.  Although Wolfson

bears the burden in moving for a Rule 15 deposition, *see Whiting*, 308 F.2d at 541; *Kelley*, 36 F.3d at 1124, his motion is silent as to the mechanism by which the deposition will occur and its attendant procedures.

Upon receiving Wolfson's motion, counsel for the Government consulted with the Office of International Affairs of the United States Department of Justice ("OIA") and the Office of the Legal Adviser at the U.S. Department of State (the "State Department") about the procedures to obtain testimony from a witness located in Cyprus. The officials consulted by the Government at OIA and the State Department are unaware of a Rule 15 deposition ever having occurred in Cyprus.[5] The State Department noted that Wolfson may wish to consult local, Cypriot counsel to evaluate his options.[6]

Federal Rule of Criminal Procedure 15(e) requires that such a "deposition must be taken and filed in the same manner as a deposition in a civil action" and that the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial." Fed. R. Crim. P. 15(e). To depose Skittides under Rule 15, the Government understands from the State Department that Wolfson would have to prepare a letter rogatory package for this Court to transmit to the State Department, which would send the request to Cyprus via diplomatic channels, and all parties would have to await an answer from the Cypriot government.[7] Ultimate

---

[5] In one case, a request to conduct Rule 15 depositions in Cyprus and Lithuania was granted but only the deposition in Lithuania was pursued before the defendant pleaded guilty and the deposition never occurred. *United States v. Alexandre*, 22 Cr. 326 (JPC) (S.D.N.Y.).

[6] A list of attorneys is maintained on the bottom of this page: https://cy.usembassy.gov/legal-assistance.

[7] The Mutual Legal Assistance Treaty ("MLAT") between the United States and Cyprus is unavailable here, since it affords only the parties to the MLAT—which Wolfson is not—certain privileges "in connection with the investigation, prosecution, and prevention of offenses, and in proceedings related to criminal matters." *See* Treaty Between the Government of the United States

17

determination and approval of the Rule 15 deposition procedures, if any, would be determined by the Cypriot government.

The process required to execute the letter rogatory is likely to cause meaningful delay both in terms of the time that will be required to obtain the testimony and in subsequent litigation over the admissibility of any such testimony. Indeed, according to the State Department, execution of letters rogatory "may take a year or more." *See* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html. An attorney at the State Department estimated that a rule of thumb is that such requests take approximately six months to a year to even get a response.

Here, Wolfson has not yet proposed a letter rogatory package for the Court to transmit to the State Department, which would send the request to Cyprus, following which all parties would have to await an answer from the government of Cyprus. *See* 22 C.F.R. 92.54 (defining "letters rogatory"); 22 C.F.R. 92.66 (describing taking of foreign depositions and process for transmitting letters rogatory). Even in the best of circumstances, there is no assurance that the lengthy process to secure Skittides's testimony would be—or even could be—expedited.

---

of America and the Government of the Republic of Cyprus on Mutual Legal Assistance in Criminal Matters, Article 1 ("The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."). District courts have "no authority to order the Executive Branch to invoke the treaty process to obtain evidence abroad for a private citizen." *United States v. Sedaghaty*, 728 F.3d 885, 917 (9th Cir. 2013); *see also Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) (foreign relations "not subject to judicial inquiry or decision"); *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71, 5 L. Ed. 191 (1821) (Story, *J.*) (treaty-making power "not an exercise of judicial functions"). In any event, consistent with Article 1 of the treaty, which again affords certain privileges only to the parties to the treaty—*i.e.*, not Wolfson—the Government understands from OIA that during a trial deposition in Cyprus proceeding via MLAT, only the U.S. prosecutor, the Cypriot Judge, or the deponent's attorney (but *not* defense counsel) are allowed to question the deponent.

3.  *The Testimony Is Unlikely to Be Admissible*

Moreover, even if the testimony for Skittides is ultimately provided, it is far from likely that any such testimony would be admissible. *See* Fed. Rule Crim. P. 15(f) ("An order authorizing a deposition to be taken under this rule does not determine its admissibility."). As an initial matter, depending on the far-from-clear procedures employed in Cyprus and the ability of the parties to engage in meaningful direct or cross-examination, it is not clear that the deposition testimony would meet the requirements of Rule 804(b)(1). *See* Fed. R. Evid. 804(b)(1)(A)-(B) (establishing a hearsay exception for former testimony given at a "lawful deposition" being offered "against a party who had . . . an opportunity . . . to develop it by direct, cross-, or redirect examination"); *see also United States v. Cohen*, No. 08-3282, 2012 WL 289769, at *4 (C.D. Ill. Jan. 31, 2012) (finding that the deposition did not meet the Rule 804(b)(1) standard where there was no opportunity to develop testimony on cross examination).

Again, OIA and the State Department have been unable to find precedent in Cyprus for the defendant's request. For example, the extent to which the Government or Wolfson's counsel could question the witness, if at all, would be entirely at the discretion of the Cypriot government.[8] Further, it is possible that state police or a Cypriot judge would conduct the questions of the deponent, and not the Government or Wolfson's counsel. It is further unclear what rights Skittides would have with respect to declining to answer questions, and what remedies the parties would have if Skittides declined to answer questions. This significant level of uncertainty regarding whether Skittides could be deposed, cross-examined, or compelled to answer questions, and the

---

[8] *See* U.S. Department of State, Preparation of Letters Rogatory (stating that "many foreign courts do not permit foreign attorneys to participate in their court proceedings"), *available at* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html.

certainty that she cannot be held in contempt, all counsel further against granting Wolfson's motion. *See Oudovenko*, 2001 WL 253027, at *3 (denying defendant's motion for a foreign deposition, in part, because "the government would not have a full opportunity to cross-examine the witnesses, and might not even be permitted to ask any of the questions").

Finally, even assuming *arguendo* any of the testimony is otherwise admissible as former testimony pursuant to Rule 804(b)(1), the Government expects it would object, for the reasons discussed above, to the introduction of the proposed deposition testimony under the Federal Rules of Evidence. *See, e.g.*, Fed. R. Evid. 401, 403. Any such litigation would be likely to occur in advance of trial, needlessly wasting the time of the Court and diverting the attention of the parties from matters that are relevant to the administration of justice.

Where, as here, the deposition will elicit testimony that is unlikely to be admissible in the first instance, the Court should not, "at the cost of time and money, engage in an act of futility" by authorizing such a deposition. *See Drogoul*, 1 F.3d at 1555; *see also United States v. Fargsesen*, 21 Cr. 602 (LAP), 2022 WL 4110303, at *5 (S.D.N.Y. 2022) ("If the Government is unable to cross-examine the witnesses . . . any resulting testimony would almost certainly be deemed inadmissible at trial under Federal Rule of Evidence 403."). Such a result would not be in the interest of justice.

4. *If the Testimony Is Permitted to Proceed, the Court Should Order Certain Disclosures*

In addition, the Government has not received any Rule 26.2 material for Skittides. Such a disclosure is required. *United States v. Mohamed*, 18 Cr. 603 (ARR), Dkt. 113 at 4 (E.D.N.Y. Sept. 17, 2021) ("Because I find that Rule 15 depositions qualify as 'trial' under Rule 26.2, I grant the government's request and order defense counsel to produce any statements of the Rule 15 witnesses that 'relate[] to the subject matter of the witness's testimony.'" (alteration in original)

(quoting Fed. R. Crim. P. 26.2)).  Until the Government receives that material, if it exists, the proposed deposition will be different than that required by Rule 15.  *See* Fed. R. Crim. P. 15(e)(2) ("The scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial.").  Accordingly, should the Court grant Wolfson's motion—and it should not—it should, at a minimum, order defense counsel to timely produce all Rule 26.2 materials.  Moreover, under Rule 15(a)(1), the Court "may also require the deponent to produce at the deposition any designated material that is not privileged, including any book, paper, document, record, recording, or data."  *See* Fed. R. Crim. P. 15(a)(1).  In order to effectively cross-examine Skittides, the Government will need these records under Rule 15(a)(1), yet the Rybicki Declaration, which emphasizes the large scope of these hearsay materials, (*see* Rybicki Decl. ¶ 8.a. and b. (describing Skittides's "two decades of direct experience with CC-3 between approximately 2002 and 2022, including as her lawyer" and "opportunity to review voluminous records, including financial records and beneficial owner information, related to CC-3")), is silent regarding whether Skittides has preserved these records or is willing to produce them to the Government.  *See United States v. Griffith*, 20 Cr. 15 (PKC), Dkt. 167 at 7-8 (S.D.N.Y. Sept. 22, 2021) (noting the importance of the Rule 15 questioner to have "the opportunity to confront the witness with documents in the spontaneous flow of an in-person cross-examination[]").

\*        \*        \*

In sum, because any deposition testimony is likely to: (i) have limited, if any probative value to any material fact at issue; (ii) be unreliable; and (iii) be inadmissible in whole or in substantial part at trial, the Court should give considerable weight to the "countervailing factors" presented by the deposition Wolfson proposes and should deny his motion in the interest of justice.  *See* Fed. R. Crim P. 15, Advisory Committee's Note (emphasizing that a deposition should

expedite, rather than delay the administration of justice). At a minimum, where Wolfson bears the burden, *see Whiting*, 308 F.2d at 541; *Kelley*, 36 F.3d at 1124, and is seeking what may well be the first ever Rule 15 deposition in Cyprus, his motion—which is silent as to the mechanism by which the deposition will occur and its attendant procedures—fails for providing no basis to believe that "the procured testimony will be admissible at trial," *Jefferson*, 594 F. Supp. 2d at 665.

## **CONCLUSION**

For the foregoing reasons, Wolfson's motion should be denied.

Dated: New York, New York
       November 21, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

                    By:    /s/
                           _____
                           Emily Deininger
                           David R. Felton
                           Assistant United States Attorneys
                           (212) 637-2472/-2299

22