USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __5/27/2025__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                  :

UNITED STATES OF AMERICA,        :
                                    :
                                    :                 1:24-cr-91-GHW
                                    :
             -v-                 :         MEMORANDUM OPINION &
                                    :                     ORDER
ANDREY KOSTIN,                :
    a/k/a "Andrei Kostin,"      :
VADIM WOLFSON,            :
    a/k/a "Vadim Belyaev," and   :
GANNON BOND,              :
                                    :
                      Defendants.   :
----------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

Defendant Andrey Kostin is the President and Chairman of Russia's state-owned VTB Bank. In 2018, the United States government sanctioned Mr. Kostin as part of its response to Russia's annexation of Crimea four years earlier. As a result of the sanctions, Mr. Kostin was barred from owning property in the United States. This presented a problem for Mr. Kostin because he allegedly owned a luxury house in Aspen, Colorado (the "Aspen Home") through a series of shell companies.

The Government alleges that Vadim Wolfson and Gannon Bond conspired with Mr. Kostin to violate the sanctions. In particular, according to the Government, Mr. Wolfson unlawfully purchased the Aspen Home from a shell company controlled by Mr. Kostin in 2019, and Mr. Bond helped him do it.

As part of its investigation into the conspiracy, the Government obtained several search warrants. One warrant authorized a search of Mr. Wolfson's and Mr. Bond's emails. Shortly before applying for that warrant, the FBI learned new information: in 2014, four years before Mr. Kostin

was sanctioned, the company that owned the Aspen Home was sold to a shell company named Altamonte Holdings Ltd. ("Altamonte"). And, the FBI learned, the principal of Altamonte was Mr. Wolfson.

These facts were a problem for the Government's theory of probable cause. If Mr. Wolfson had indirectly purchased the Aspen Home through Altamonte before Mr. Kostin was sanctioned, then Mr. Wolfson did not unlawfully purchase the property from Mr. Kostin in the 2019 transaction targeted by the warrant. Mr. Wolfson would have been the Aspen Home's beneficial owner long before Mr. Kostin was sanctioned. When the FBI applied for the warrant, it omitted those facts. With the warrant secured, the FBI searched Mr. Wolfson and Mr. Bond's emails.

Mr. Wolfson and Mr. Bond moved to suppress the evidence obtained pursuant to that warrant under *Franks v. Delaware*. Because the FBI agent who applied for the warrant recklessly omitted material facts showing that an entity associated with Mr. Wolfson had purchased the Aspen Home in 2014, Mr. Wolfson and Mr. Bond's motion to suppress the fruits of that search warrant is granted. The remainder of the defendants' motions to suppress are denied for the reasons that follow.

## I.    BACKGROUND

### A. Overview of the Indictment

As context for the reader, the Court begins with an overview of the allegations in the indictment. Defendants Andrey Kostin, Vadim Wolfson, and Gannon Bond are charged with violating the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, by engaging in a "scheme" to benefit Mr. Kostin.[1] *See* Dkt. No. 13 ("S2") ¶¶ 1, 23, 54–60.

---

[1] "The IEEPA gives the President the authority 'to deal with unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States' by 'declar[ing] a national emergency with respect to such threat.' 50 U.S.C. § 1701(a). In exercising this power, the President may 'investigate, regulate, or prohibit' as proscribed by section 1702 of the act. Criminal penalties under the act are for those who 'willfully commit[ ], willfully attempt[ ] to commit, or willfully conspire[ ] to commit, or aids or abets the commission of' a violation of the President's regulations

According to the indictment, Mr. Kostin is the President and Chairman of Russia's state-owned VTB Bank. *See id.* ¶ 5. Mr. Wolfson is a Russian national with legal residency in the United States. *Id.* ¶ 6. Mr. Bond is a United States national who allegedly worked for Mr. Wolfson as his personal assistant. *Id.* ¶ 7.

As the indictment describes, shortly after Russia invaded and annexed the Crimea region of Ukraine in February and March 2014, the President of the United States issued a series of executive orders pursuant to IEEPA that imposed sanctions on certain Russian officials. *Id.* ¶¶ 11–14, 41. Pursuant to those executive orders, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated each of the sanctioned individuals as a Specially Designated National ("SDN"). *Id.* Once labeled an SDN, an individual is barred from owning or holding property inside the United States. *Id.* People living inside the United States are also prohibited from "dealing" in the property of an SDN, and from engaging in transactions that benefit any SDN living abroad, unless otherwise authorized. *Id.* The executive orders also prohibit anyone living in the United States from making "contributions" or providing "funds, goods, or services, by, to, or for the benefit of any person or entity on the SDN List." *Id.* ¶ 16.

The United States announced sanctions against a Russian lender—a prominent Russian bank called Bank Rossiya—at the end of March 2014. *Id.* ¶ 41. OFAC sanctioned VTB Bank on or about July 29, 2014. *Id.* ¶ 20. In December 2017, public media reports emerged about "anticipated new U.S sanctions that were likely to be imposed . . . as a result of the ongoing Russia-Ukraine war." *Id.* ¶ 46. Mr. Kostin allegedly recognized the "high risk" that he would be added to the list of SDNs. *Id.* And, indeed, on April 6, 2018, OFAC designated Mr. Kostin as an SDN given his status as "'an official of the Government of the Russian Federation' in his role as 'the President, Chairman

---

or prohibitions issued pursuant to the IEEPA." *See United States v. Griffith*, 515 F. Supp. 3d 106, 114 (S.D.N.Y. 2021) (alterations in original).

of the Management Board, and Member of the Supervisory Council of state-owned VTB Bank.'" *Id.* ¶ 21.  Mr. Kostin was, consequently, blocked from owning property or transacting business in the United States after April 6, 2018.[2]  *Id.* ¶¶ 14–22.

As relevant here, the indictment alleges that from at least April 6, 2018—the date Mr. Kostin was sanctioned—through at least September 2019, Mr. Wolfson and Mr. Bond conspired to provide funds, goods, and services to Mr. Kostin and his businesses through the operation, maintenance, and sale of a luxury house located in Aspen, Colorado, described in the indictment as the "Aspen Home."  *Id.* ¶¶ 55–58.

### B.  The Alleged Sanctions Violations

According to the indictment, Mr. Kostin allegedly purchased the Aspen Home "for approximately $13.5 million in the name of 40 North Star LLC ('40 North Star'), a Colorado limited liability company that was formed in 2010 . . . ."[3]  *Id.* ¶ 34.  The indictment describes a series of transactions related to the Aspen Home that followed on the heels of the sanctions announced in 2014.  First, the indictment alleges that approximately two months after OFAC sanctioned Bank Rossiya and two months before OFAC sanctioned VTB Bank, the "nominal ownership of 40 North Star was transferred" to an entity called Altamonte Holdings Limited ("Altamonte"), which the indictment describes as "a new shell company."[4]  *Id.* ¶¶ 42–43.  To facilitate the transaction, Altamonte allegedly borrowed $10 million from a lender called Capital Business Finance, which the Government alleges is "owned and controlled through various shell companies . . . on behalf of [Mr.] Kostin . . . ."[5]  *Id.* ¶¶ 43–44.

---

[2] Once designated as SDN, unless otherwise exempt, "there are significant restrictions on the SDN's ability to transact in the United States or with [United States] persons."  S2 ¶ 3.

[3] The indictment alleges that Mr. Kostin "owned and controlled 40 North Star through, at various times, a series of additional shell companies, nominee owners, intermediaries, and trust structures."  *Id.* ¶ 35.

[4] Altamonte was registered in the British Virgin Islands one month earlier, in April 2014.  *Id.* ¶ 42.

[5] The indictment alleges that Capital Business Finance "is owned and controlled, through various other shell companies and intermediaries, by CC-1 and CC-3," who are unnamed co-conspirators, "on behalf of" Mr. Kostin.  *Id.* ¶ 44.  In

Second, the Government alleges that, from 2014 through 2017, Capital Business Finance funneled money through Altamonte to 40 North Star to support Mr. Kostin's visits to and maintenance of the Aspen Home.[6]  *Id.* ¶ 45.  As of 2017, Mr. Kostin had not yet been designated as an SDN, and he allegedly continued to visit the Aspen Home.  *Id.* ¶ 38.

Third, the Government alleges that in or about September 2019—after Mr. Kostin was sanctioned in April 2018—Mr. Kostin "sold the Aspen Home" to Mr. Wolfson for approximately $12 million.[7]  *Id.* ¶ 4.  According to the Government, the sale was, in effect, a $12 million payment from Mr. Wolfson to Mr. Kostin.  *Id.*  To accomplish the sale, the Government alleges, Mr. Wolfson transferred $11.8 million "from a Cyprus bank account Wolfson controlled to CapitalInvest Limited ('CapitalInvest')," which is a wholly-owned subsidiary of Capital Business Finance.[8]  *Id.* ¶ 48.  As a result of this transaction, the Government charges Mr. Wolfson with "caus[ing] approximately $12 million to be transferred to a shell entity controlled by Kostin, for Kostin's benefit . . . ."  *Id.* ¶ 56 (count three), ¶ 60 (count five).  The Government alleges that although "the nominal ownership of 40 North Star changed at certain points in the period between 2010 and September 2019, Kostin remained at all relevant times, the true beneficial owner of the Aspen Home."  *Id.* ¶ 35.

Mr. Wolfson presents a competing narrative.  According to Mr. Wolfson, he did not buy the Aspen Home in 2019 as part of a scheme to benefit Mr. Kostin; rather, he contends that he purchased the Aspen Home in 2014 through his legitimate company, Altamonte, using a third-party

---

particular, "Capital Business Finance's shares are held by a nominal shareholder in trust for a shell company called Gesford Holdings, which is in turn owned by Atkien Enterprises, as a nominee for CC-1, and Ionic Nominees Limited, as a nominee for CC-3."  *Id.* ¶ 44.

[6] Specifically, the indictment alleges that "Capital Business Finance regularly funded the bank account used by Altamonte in advance of Altamonte making payments to 40 North Star . . . ."  *Id.* ¶ 45.

[7] The Government also alleges that, beginning around January 2018, Mr. Wolfson took over as the primary user of the Aspen Home.  *Id.* ¶¶ 47–48.

[8] The indictment also alleges that Mr. Wolfson purchased the Aspen Home by "causing Altamonte to transfer $200,000 to CapitalInvest."  *Id.* ¶ 48.

loan.  Mr. Wolfson contends that he repaid the $12 million loan in 2019 to CapitalInvest, an entity separate and distinct from Mr. Kostin.

### C.  Procedural History

On February 20, 2024, the Government filed a sealed indictment in this case.  Dkt. No. 4. The same day, the Government filed two superseding indictments.  Dkt. Nos. 8, 13.  On February 22, 2024, the indictments were unsealed.  Dkt. No. 5.  Mr. Bond and Mr. Wolfson were arrested on February 22, 2024.

Mr. Wolfson and Mr. Bond filed several pre-trial motions.  Dkt. No. 86; Dkt. No. 87 ("Bond Mem."); Dkt. No. 102 ("Bond Reply"); Dkt. Nos. 74-83.  First, Mr. Bond and Mr. Wolfson moved to suppress evidence seized pursuant to five warrants secured by the Government throughout its investigation into Mr. Kostin.  Bond Mem. at 16; Dkt. No. 81; Dkt. No. 82 ("Rybicki Decl."); Dkt. No. 83 ("Wolfson Omnibus Mem.") at 11.  FBI Special Agent Danielle Lockridge swore out each of the affidavits that supported the five warrants.

In their motions, Mr. Wolfson and Mr. Bond moved to suppress evidence obtained pursuant to four of the five warrants under *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  The four warrants subject to the *Franks* motion include:  (1) an October 21, 2022 search warrant for Mr. Wolfson's and Mr. Bond's email accounts, *see* Government Hearing Exhibit ("GX") 23 (the "Email Warrant"); (2) a December 5, 2023 search warrant for iCloud accounts associated with Mr. Bond and Mr. Wolfson, *see* Bond Mem. Exhibit F (the "iCloud Warrant"); (3) a February 20, 2024 search warrant for the cell phone location information for Mr. Wolfson's and Mr. Bond's cellphones, *see* Rybicki Decl. Exhibit N (the "Cellphone Location Warrant"); and (4) a February 21, 2024 warrant to search Mr. Wolfson's Texas residence, to seize and search his cell phone, and to seize certain artwork from the house.  *See* GX 24 (the "Wolfson Premises Warrant").  Mr. Bond also moved to suppress evidence obtained pursuant to a February 21, 2024 warrant to search his New Jersey residence and his

cellphone under the fruit of the poisonous tree doctrine.  *See* Bond Mem. Exhibit O (the "Bond Cellphone Warrant"); Bond. Mem. 20–21.  He argued that the Bond Cellphone Warrant's "probable cause attestations were based, in large part, on evidence that appears to have been seized pursuant to the [Email] and [iCloud] Warrants," which, he contends, were tainted under *Franks. Id.*[9]

In their *Franks* motions, Mr. Bond and Mr. Wolfson argued that Special Agent Lockridge's affidavits contained false or misleading information and omitted material facts.  Chief among the allegedly omitted facts, they argued, was information that Special Agent Lockridge learned days before applying for the Email Warrant, namely, that Mr. Wolfson's company, Altamonte, purchased 40 North Star in 2014.  This 2014 transaction represented a critical link in the chain of ownership between Mr. Kostin's alleged 2010 purchase of the Aspen Home, and Mr. Wolfson's alleged 2019 purchase of 40 North Star from Mr. Kostin.  Bond Mem. at 16; Wolfson Omnibus Mem. at 11.

The Government opposed the motions.  Dkt. No. 93 ("Opp.").  In its opposition to the motion to suppress the fruits of the Email Warrant, the Government argued that the assertions contained in the affidavit accurately represented the facts learned during the FBI's investigation, namely, that Mr. Wolfson purchased the Aspen Home from Mr. Kostin in 2019.  Alternatively, the Government argues, even if Mr. Wolfson indirectly purchased 40 North Star through Altamonte in 2014, his transfer of $12 million to CapitalInvest in 2019 still violated IEEPA because Mr. Kostin, it contends, controls CapitalInvest.

Second, in addition to the motion to suppress the fruits of the warrants under *Franks*, Mr. Wolfson filed a motion to suppress an un-*Mirandized* statement, and the evidence obtained by the Government using the statement.  Dkt. No. 77; Dkt. No. 78 ("Rybicki Miranda Decl."); Dkt. No. 79

---

[9] Because the Court suppresses the evidence obtained pursuant to the Email Warrant under *Franks*, the Court need not address Mr. Bond's alternative argument that the fruits must be suppressed because the Email Warrant is facially defective.  *See* Bond Mem. at 13.

("Miranda Mem."); Dkt. No. 107. Mr. Wolfson contends that a *Miranda* violation occurred when FBI Special Agent Rolland Chattaway asked Mr. Wolfson for his phone's passcode during his arrest. Mr. Wolfson provided the passcode. The FBI then used the passcode to unlock and search his phone and iPad. Because of the *Miranda* violation, Mr. Wolfson seeks suppression of the contents of his phone and iPad. *See* Miranda Mem. at 9. Alternatively, Mr. Wolfson argues that his statement was coerced in violation of due process and that, therefore, the fruits of his statement must be suppressed. Dkt. No. 99 ("Wolfson Reply") at 7–9; Dkt. Nos. 100, 101. Mr. Wolfson sought an evidentiary hearing regarding the voluntariness of his statement. Wolfson Reply at 12. The Government, in response, conceded that the FBI had obtained the passcode following a *Miranda* violation. Opp. at 22. It agreed not to introduce the statement itself at trial. *Id.* With respect to suppression of the evidence obtained using the passcode, however, the Government presented two arguments. The Government contended that *Miranda* violations only require suppression of the statement, not the evidence obtained using the statement. The Government also argued that even if the statement was involuntary, suppression was not warranted under the doctrine of inevitable discovery because the FBI would have obtained most of the contents of Mr. Wolfson's devices even without the passcode. *Id.* at 22–23.

Third, Mr. Wolfson filed a motion to suppress allegedly privileged records. Dkt. No. 74; Dkt. No. 75; Dkt. No. 76 ("Privilege Mem."). At issue were approximately 16,000 documents that Mr. Wolfson's former Cyprus-based lawyer voluntarily produced to the Government. *See* Privilege Mem. at 1. To "effectuate suppression," he asked that the Court order the return of the documents. *Id.* at 10. Alternatively, he proposed that "all files produced by the Firm should be required to go through filter team review." *Id.* at 11. The Government contended that the records are not

privileged and that suppression is inappropriate. Finally, Mr. Wolfson sought a bill of particulars, and access to the grand jury materials. *See* Wolfson Omnibus Mem. at 6–8, 13–15.[10]

## II.    FACTUAL FINDINGS

On March 12, 2025, the Court held an evidentiary hearing in connection with the motion to suppress the Email Warrant, and with respect to the voluntariness of Mr. Wolfson's statement. *See* Transcript of Suppression Hearing ("Tr."). FBI Special Agent Danielle Lockridge, who swore out the Email Warrant, testified at the hearing. FBI Special Agent Rolland Chattaway, the agent who obtained Mr. Wolfson's passcode, also testified. Documents relating to the Email Warrant and video of Mr. Wolfson's arrest and statement were also admitted as evidence.[11] The following section of this opinion contains the Court's findings of fact from that hearing.

### A.    The FBI's Investigation into the Defendants' Sanctions Violations

#### 1.    Special Agent Lockridge's Investigation

The first witness who testified was Special Agent Lockridge. At the time of the hearing, she was working for the FBI as a supervisory special agent in the international operations division. Tr. 13:1-4. She had worked at the FBI for almost ten years. Tr. 14:9-10. Previously, she worked in the Washington D.C. field office as a special agent on the FBI's transnational organized crime squad, where she investigated organized crime, criminal enterprise, and sanctions violations. Tr. 13:16-25–

---

[10] Mr. Bond also filed a motion to strike from the indictment facts related to IEEPA's background and Mr. Kostin's superyacht conspiracy. *See* Bond Mem. at 26. On March 17, 2025, the parties filed a letter, which stated: "The parties have conferred and agree that the preference is for no indictment to be provided to the jury. As a result, we believe that the issues raised in the pending motion to strike are moot." Dkt. No. 125. Accordingly, the Court denies Mr. Bond's motion to strike as moot and does not address it in this opinion.

[11] On March 17, 2025, Mr. Wolfson and Mr. Bond filed a letter informing the Court that the Government produced additional documents related to the Email Warrant and asked that the documents "be admitted as exhibits for the Court's consideration." Dkt. No. 129. The Government replied on March 19, 2025. Dkt. No. 131. Because the Court is granting Mr. Wolfson's and Mr. Bond's motion without the need to review the post-hearing materials, the Court need not act on those letters.

14:1-7. While working on the organized crime squad, Special Agent Lockridge began investigating Mr. Kostin. Tr. 14:8-10.

The Kostin investigation began in March 2022. Tr. 14:8-12. At the time, Mr. Kostin was the President and Chairman of VTB Bank. Tr. 15:1-4. He assumed that role in 2010. Tr. 15:5-6. In April 2018, OFAC designated Mr. Kostin as an SDN. Tr. 15:7-25–16:1-3. This designation barred him from owning property inside the United States.

Special Agent Lockridge's investigation initially focused on the question of whether Mr. Kostin violated the OFAC sanctions by owning several superyachts. Tr. 16:4-16. Mr. Kostin did not hold the yachts in his own name, but Special Agent Lockridge believed that he owned them based on information she learned from the yachts' captains and crew, and her review of related documents. Tr. 16:14-26–17:1-7. Mr. Kostin, she believed, used shell companies and nominee owners to obfuscate his ownership of the assets. Tr. 16:4-25–17:12. She learned that two of Mr. Kostin's associates, Christodoulos Vassiliades and Eric Whyte, helped Mr. Kostin manage the yachts. Tr. 17:13-19. She believed that Mr. Vassiliades, a Cypriot lawyer, created the shell companies that nominally owned the assets. Tr. 18:9-19. Mr. Whyte, she learned, acted as the "nominee shareholder," meaning that Mr. Kostin would list Mr. Whyte's name as the owner "on paper" instead of his own. Tr. 18:2-5.

At some point during her investigation, Special Agent Lockridge began to suspect that Mr. Kostin also owned property in the United States. Tr. 18:20-23–19:1. While reviewing travel records, Special Agent Lockridge noticed that Mr. Kostin and his family often listed an address in Aspen, Colorado as their destination. Tr. 19:2-6. That address was 40 North Star, Aspen, Colorado. Tr. 19:7-8. An entity called 40 North Star LLC owned this property. Tr. 27:15- 28:15. Her goal became to find out who owned this property. Tr. 116:9-12; 117:7-21. She spoke with witnesses and subpoenaed documents related to the Aspen Home. Tr. 71:19-22. Of the nine witnesses she spoke

with, two are of moment:  Mary Tanguay, the property manager, and Herb Klein, the lawyer who managed 40 North Star.

Special Agent Lockridge first interviewed Ms. Tanguay in September 2022.  Tr. 38:1-10.  A second FBI agent interviewed Ms. Tanguay in October 2022 and prepared a report summarizing the interview.  Tr. 38:12-20.  Special Agent Lockridge was not present for the October 2022 interview, but she had reviewed the report.  Tr. 38:16-20.  Both interviews occurred before Special Agent Lockridge applied for the Email Warrant.  Tr. 38:21-25.

During the two interviews, Ms. Tanguay reported that she had worked as the Aspen Home's property manager from 2010 to 2020.  Tr. 39:11-12.  She managed the general upkeep and maintenance of the house, handling tasks like scheduling workers and cleaners, and "taking care of the family that owned the home when they came for vacation."  Tr. 39:1-8.  Mr. Kostin and his family, Ms. Tanguay reported, visited the Aspen Home about two or three weeks every year around Christmas.  Tr. 38:23-24.  Mr. Wolfson also visited once or twice.  Tr. 40:16-17.  Ms. Tanguay reportedly believed Mr. Kostin had invited Mr. Wolfson to visit.  Tr. 40:24-25–41:1.  She also told Special Agent Lockridge that in May 2018—about a month after OFAC sanctioned Mr. Kostin— Mr. Kostin's wife called Ms. Tanguay and let her know that the Kostin family "was no longer going to be coming to the house."  Tr. 40:9-11.  She reported that Mr. Wolfson, who had previously visited the Aspen Home only "once or twice," began to visit more frequently.  Tr. 40:14-17.

Ms. Tanguay said that she did not know who owned the Aspen Home.  She told Special Agent Lockridge that, based on "her understanding through the interactions with the family that was there the most, the primary owner was Andrey Kostin."  Tr. 39:9-20.  But she also expressly stated that she did not know who owned the house "on paper."  Tr. 40:13-19.  Ms. Tanguay did not talk about "the entities" that owned 40 North Star.  Tr. 41:2-4.  She also never volunteered whether "she

believed that Kostin had ceased being the true owner of the home prior to being sanctioned in 2018." Tr. 42:12-18.

Special Agent Lockridge also interviewed Mr. Klein, the lawyer who managed 40 North Star. She interviewed him for the first time on September 9, 2022, and again later that month. Tr. 27:19-22; Tr. 152:16-20. During those interviews, Mr. Klein reported that Mr. White and Mr. Vassiliades initially approached him in 2010 about buying a house for a "wealthy client of theirs." Tr. 27:2-10. They did not name the client. *Id.* Mr. Klein explained to Special Agent Lockridge that he created 40 North Star to purchase the house. Tr. 26:14-16–27:12-14. He also reported that, after his 2010 meeting with the two Kostin associates, Mr. Whyte "faded away" and was not involved going forward. Tr. 146:11-15.

During the September 9, 2022 interview, Mr. Klein told Special Agent Lockridge that the ultimate beneficial owner of 40 North Star was "anyone's guess."[12] 154:13-15. He reported that, in 2010, an entity called Soltrop Holdings Ltd. ("Soltrop") initially owned 40 North Star. Tr. 27:15-19. Mr. Klein explained that, in 2013, Soltrop was sold to a company called Ledridge, which then sold 40 North Star to a company called Altamonte in 2014. Tr. 27:15-24; Tr. 110:1-8. Mr. Klein told Special Agent Lockridge that he did not know who owned Altamonte. Tr. 28:1-2. Mr. Klein also described that, in 2018, Mr. Bond became the main point of contact for the property. Tr. 81:21-25–82:1-12. According to Mr. Klein, Mr. Wolfson bought 40 North Star "from Altamonte" in 2019. Tr. 33:22-25–34:1-2.[13]

---

[12] Special Agent Lockridge initially testified that Mr. Klein told her during their interview that he "believed" that Mr. Kostin owned the Aspen Home between 2014 and 2018, a belief he formed because Ms. Tanguay told him, in 2010, that Mr. Kostin was the owner, and based on his limited personal interactions with Mr. Kostin. Tr. 35:21-25–36:1-13. The Court discredits this testimony because Special Agent Lockridge later testified, based on a review of her handwritten notes taken during the conversation, that Mr. Klein actually told her that the ultimate beneficial owner of 40 North Star was "anyone's guess." Tr. 154:1-15.

[13] Special Agent Lockridge testified that she initially misunderstood Mr. Klein's explanation of this transaction. Tr. 35:21-36:4. She believed that Mr. Klein reported that Mr. Wolfson purchased Altamonte itself, when in fact Mr. Klein reported that Mr. Wolfson purchased *40 North Star from* Altamonte. Her typed report memorializing the Klein

The Government also served subpoenas on Mr. Wolfson, Mr. Bond and Mr. Klein. Tr. 42:2-3.  The subpoenas requested financial records and documents related to the ownership of 40 North Star "from its inception to the present date."  Tr. 43:16-17.  The subpoena directed to Mr. Klein was directed to him in his capacity as the managing representative of 40 North Star.  GX 16 (the "Klein Subpoena"); Tr. 43:6-7.  The purpose of the subpoena was to learn "who owned [40 North Star] and when."[14]  Tr. 118:22-24.

Counsel for 40 North Star, Turner Smith, responded to the Klein Subpoena on October 14, 2022.  Defense Exhibit ("DX") 49 (the "Turner Smith Email"); Tr. 98:4-25–99:1-13; Tr. 172:9-10.[15]  Mr. Smith also represented Mr. Wolfson and Mr. Bond.  Tr. 172:12-15.  In his cover email, Mr. Smith stated:  "In response to the listed subpoenas, I have assembled records responsive to the questions of ownership changes and financial transactions that are the subject of your inquiry."  *Id.*  He sent about 900 documents (the "Smith Production").[16]  Mr. Smith, in his email, explained that "the documents circa 2010 to April 2014 are from a time prior to Mr. Wolfson's purchase of the membership interest in 40 North Star LLC (through an entity named Altamonte Holdings Limited."  Turner Smith Email at 2.  Mr. Smith provided those documents in a separate

---

[14] interview (the "FD302")—which she prepared on October 14, 2022 over a month after the September 9, 2022 interview—reflects this misunderstanding.  Tr. 132:25-133:1-12; Tr. 152:7-13.  Her FD302 incorrectly described the 2019 transaction as Klein had reported it.  Special Agent Lockridge confirmed that her FD302 "is not a reliable indication of what Herb Klein told [her]" about the 2019 transaction.  Tr. 133:2-14.  She initially misunderstood "because the information was very new and fresh" when she wrote the FD302, and she "didn't have any documents" at the time.  Tr. 34:1-22–36:1-5.

[14] The cover letter to the Klein Subpoena states:  "In lieu of personally appearing before the Grand Jury on the date indicated, you may comply with this grand jury subpoena by promptly providing the requested records in the manner described in the subpoena attachment."  Klein Subpoena at 1.  The attachment requests "any and all documentation" related to three categories.  Klein Subpoena at 6.  The first category was "the records relating to the ownership interests of 40 North Star LLC from its inception to the present date;" the second was "the change of ownership interest that occurred in approximately 2019;" and the third was "records of financial transactions from January 1, 2018, to June 24, 2020, to include all financial records where 40 North Star, LLC, sent or received payment from anyone individual or any business entity for costs, transactions, or other financial dealings associated with the property located at 40 Northstar Circle, Aspen, Colorado 81611."  *Id.*

[15] The subject of the email is "40 North Star LLC Subpoenas."  *See* Turner Smith Email.

[16] The Turner Smith email states that his productions "are identified with the Bates numbers 40NS0000001-40NS0000929."  Turner Smith Email at 2.

zip file. *Id.* Before swearing out the Email Warrant, Special Agent Lockridge had "skimmed everything" in the Smith Production, but "didn't read every line." Tr. 121:5-6.

The Smith Production contained a paper trail documenting the changes to 40 North Star's ownership between 2010 and 2019. For example, a Cyprus registration document showed that Soltrop—the entity that Mr. Klein had reported owned 40 North Star in 2010—was owned by a company that the FBI believed to be associated with one of Kostin's superyachts. GX 5 (2010 Soltrop registration certificate); Tr. 26:4-25–48:1-10. A 2014 purchase agreement showed, as Klein had reported, that Altamonte purchased 40 North Star from Ledridge. DX 6 (Ledridge/Altamonte purchase agreement); Tr. 105:4-7.

Two documents from 2018 revealed additional information about the beneficial ownership of 40 North Star. A January 2018 email, for example, was sent to Mr. Klein from an address associated with Mr. Whyte's assistant, instructing that "all business correspondence" and "necessary approvals regarding the object should be done through the authorized representative— Mr. Gannon Bond . . . ." GX 14 (January 11, 2018 email to Mr. Klein). Tr. 58:1-19. An April 2018 bank form shows that Mr. Klein had listed Mr. Wolfson as the beneficial owner of 40 North Star. *See* GX 13 (Certification of Beneficial Owners); Tr. 56-57.

Finally, several documents memorialize the 2019 deal between Mr. Wolfson, Altamonte, and CapitalInvest in which Mr. Wolfson bought 40 North Star from Altamonte. A September 18, 2019 purchase agreement between Altamonte and Mr. Wolfson shows his purchase of 40 North Star from Altamonte for $11.8 million. DX 9 (share purchase agreement). Additionally, a 2019 settlement agreement ties that deal to CapitalInvest. GX 11 ("2019 Loan Settlement Agreement"). It states that—considering Altamonte's debt of $12 million to CapitalInvest pursuant to a 2014 loan agreement—Mr. Wolfson would pay $11.8 million to CapitalInvest on behalf of Altamonte, and

Altamonte would pay the remaining $200,000.  *See* 2019 Loan Settlement Agreement at 1-2;

Tr. 136:24-25–137:1-13.

On October 3, 2019, one of Mr. Wolfson's employees emailed Mr. Bond, summarizing the

2019 transaction.  GX 15 ("2019 Bond Email").  The email tells Mr. Bond that "100% shares of 40

NS were sold to Vadim."  *Id.*  The email lists the details of the transaction, namely, that Mr. Wolfson

paid $12 million to CapitalInvest in settlement of a loan agreement between CapitalInvest and

Altamonte, in exchange for ownership of 40 North Star.  The email reads as follows:

1. Vadim purchased from Altamonte 100% shares of 40NS (SPA agreement, price, 11,800,000 USD.
2. Altamonte owed to CapitalInvest money in accordance with the loan agreement.  The amount on 30/09/2019 was 12,001,610,96 USD (10,000,000 body + 2,001,610.96 interest)
3. Vadim made direct payment from his account in RCB to CapitalInvest (please see attached settlement agreement) in amount 11,800,000 USA (so, SPA was paid like this in accordance with settlement agreement).
4. The rest of amount for the loan 201,610.96 USD Altamonte paid directly to CapitalInvest from its own account.

*Id.* at 2.  On October 8, 2019, Mr. Bond forwarded the October 3, 2019 email to Ms.

Tanguay.  *Id.* at 1.  Mr. Bond wrote:  "Please forward to Herb so as to get a plan of action to

formalize the new ownership of 40 Northstar as directly owned by principle [sic]."  *Id.*  Special

Agent Lockridge understood the reference to "principle" in this email to be Mr. Wolfson.  Tr. 87:5-

7.  Attached to the Bond Email were other receipts showing the $11.8 million payment from Mr.

Wolfson to CapitalInvest.  2019 Bond Email at 4.

## 2.     Special Agent Lockridge's Knowledge of Who Owned 40 North Star

Based on her investigation, Special Agent Lockridge knew the following facts concerning 40

North Star's ownership when she swore out the Email Warrant.  In 2010, Mr. Kostin purchased 40

North Star via Soltrop.  In 2013, Soltrop was sold to Ledridge.  In 2014, Ledridge sold 40 North

Star to Altamonte.  Tr. 48:1-14; Tr. 110:1-8.  Mr. Klein had reported these transactions, and the

Smith Production corroborated each transfer.  *Id.*  She recalled reviewing the Ledridge/Altamonte purchase agreement before swearing out the affidavit.  Tr. 103:24-25–104:1-8.  She understood that the Ledridge/Altamonte purchase agreement demonstrated that Altamonte purchased "the home from the Ledridge entity in 2014."  Tr. 106:10-13.

As of 2014, Mr. Wolfson indirectly owned 40 North Star.  Special Agent Lockridge knew of Mr. Smith's representation that Mr. Wolfson owned Altamonte.  Tr. 108:18-21.[17]  She also knew that there was a 2014 loan agreement that involved CapitalInvest, Altamonte, and Mr. Wolfson in some capacity.  Tr. 137:10-16.[18]

Finally, in 2019, Mr. Wolfson purchased 40 North Star from Altamonte.  Tr. 33:1-35:5.  Mr. Klein reported this fact during his September 9, 2022 interview.  Tr. 33:22-25–34:1-2.  Additionally, Special Agent Lockridge knew that Mr. Wolfson's 2019 payment of $12 million was made to CapitalInvest and that it was related to the 2014 loan agreement.  Tr. 137:14-16.

### 3.    Special Agent Lockridge's Modifications to the Email Warrant

Before submitting the Email Warrant on October 21, 2022, Special Agent Lockridge drafted and edited the supporting affidavit.  Tr. 140:15-22.  She emailed back and forth with a Department of Justice trial attorney, editing the document and tracking her changes along the way. Tr. 140:18-25–141:1-16.  She reviewed each statement in order to ensure that the statements were

---

[17] The following exchange occurred:
> Q.    And as of October 14, prior to your October 21 warrant affidavit, you had been in receipt of the representation from Turner Smith that Mr. Wolfson owned Altamonte.
> A.    We did.

Tr. 108:18-21.

[18] When asked about the 2019 Loan Settlement Agreement between Mr. Wolfson, CapitalInvest, and Altamonte, the following exchange occurred:
> Q:    You knew that there was a purchase and loan agreement in 2014, correct?
> A:    Yes.

Tr. 137:11-13.

accurate. Tr. 141:15-25. Her tracked changes—and the final affidavit—represented her "conscious decision" about what information to include, and what not to include. Tr. 142:1-7.

In crafting the affidavit, the special agent made editorial choices. She included the fact that Mr. Kostin had purchased 40 North Star in 2010, and wrote that Mr. Wolfson "effectively" purchased it in 2019, but she did not include any changes in 40 North Star's ownership in the period between 2010 and 2019. She did not include the fact that Soltrop was sold to Ledridge in 2013, or that Ledridge sold 40 North Star to Altamonte in 2014. With respect to Altamonte's 2014 purchase of 40 North Star, Special Agent Lockridge consciously omitted that transaction from the Email Warrant. She testified that she did not think it was "significant enough" to include. Tr. 108:18-25–109:1-16.[19]

Additionally, Special Agent Lockridge omitted the fact that counsel for 40 North Star had told her that Mr. Wolfson owned Altamonte and that he, "through Altamonte, purchased 100 shares of 40 North Star in 2014." Tr. 102:16-24.[20] Special Agent Lockridge had received Mr. Smith's email containing the fact that Mr. Wolfson owned Altamonte, and testified during the hearing that she

---

[19] At the hearing, the following exchange occurred:

Q.  You did not review the document in great detail to see the 10-million-dollar purchase agreement between Altamonte and Ledridge in May 2014; is that correct?
A.  I -- well, yes, I had reviewed that. It's at the top of the document.
Q.  Nonetheless, you decided not to include that in your warrant affidavit.
A.  We did not include it, no.
Q.  You did not think it was significant enough to include.
A.  Apparently not at the time, no.

Tr. 108:18-25–109:1-16.

[20] When asked about this, Special Agent Lockridge answered as follows:

Q.  And as of October 14, prior to your October 21 warrant affidavit, you had been in receipt of the representation from Turner Smith that Mr. Wolfson owned Altamonte.
A.  We did. However, we started drafting that search warrant application prior to that time.
Q.  And you didn't include the fact that Mr. Wolfson, through Altamonte, purchased 100 percent interest in the house –
A.  We did not.

Tr. 102:16-24.

"remembered not putting that information in the warrant." Tr. 123:7–124:6. Special Agent

Lockridge testified as follows:

> Q:  What you read was the email that Turner Smith had sent you.
> A:  Correct.
> Q:  And you remember reading that?
> A:  Yes.
> *Q:  All right.  And you remember not putting that information in the warrant; correct?*
> *A:  Not putting his – the statement –*
> *Q:  The 2014 transaction.  You didn't put that in there.*
> *A:  Correct.  Correct.*
> *A:  You didn't put it in there that you had been informed through the subpoena*
> *    returns that Wolfson owned Altamonte; correct?*
> *A:  Correct.*
> Q:  And you didn't put in that, in 2014, Altamonte bought the shares; correct?
> A:  Correct.
> Q:  All right.  What you did put in was that in 2010 it was your view, based on your
>     Investigation, that Kostin bought it; right?
> A:  Yes.
> Q:  And then what you put in was in 2019, Wolfson bought it; right?
> A:  Yes.

Tr. 123:7–124:6 (emphasis added).  Special Agent Lockridge was also aware of the fact that Mr.

Wolfson's payment in 2019 was in the form of a loan repayment paid to CapitalInvest, but did not

include that fact in the affidavit.  Tr. 135:21-25—136:1-7.

On October 19, 2022, days before submitting the Email Warrant, she edited the affidavit and

tracked her changes.  Tr. 179:2-6.  The draft of the affidavit originally read, "In 2019, after Kostin

was sanctioned by OFAC, Kostin's interest in 40 North Star LLC was transferred to Vadim Wolfson

('Wolfson')."  Special Agent Lockridge edited the sentence in track changes to read, "In 2019, after

Kostin was sanctioned by OFAC, Vadim Wolfson ('Wolfson') *effectively purchased the interest in 40 North*

*Star LLC*."  Tr. 180:17-21; Email Warrant ¶ 34(c) (emphasis added).  Those revisions were included

in the final affidavit.

At the hearing, the Government introduced the final version of the Email Warrant into

evidence.  *See* Email Warrant.  It was dated October 21, 2022, approximately five months after the

investigation into Mr. Kostin began. *Id.* A magistrate judge of the United States District Court for

the District of Columbia signed it. *Id.* The warrant authorized the search of multiple email

accounts. *Id.* One of the email accounts belonged to Mr. Wolfson, and two belonged to Mr. Bond.

*See* Email Warrant at ECF pages 4, 6. In support of her application for the warrant, Special Agent

Lockridge submitted a twenty-nine-page sworn affidavit. *See* Email Warrant. The affidavit asserted

that there was probable cause to believe that Mr. Kostin "and those individuals who have been

facilitating Kostin's sanctions-evasion and money-laundering schemes" violated IEEPA, and that

the email accounts contained "evidence, instrumentalities, contraband, or fruits" of those crimes.

*See* Email Warrant at ECF page 35 ¶ 4. In the affidavit, Agent Lockridge asserted that its factual

recitations did "not set forth all of my knowledge, or the knowledge of others, about this matter."

*Id.* ¶ 3. The affidavit contains four pages of background on the IEEPA sanctions. Email Warrant at

ECF pages 36–39.

The affidavit then asserted facts that it contended would support a finding of probable

cause. The probable cause section of the affidavit was organized into three sub-sections. First,

Special Agent Lockridge asserted facts related to Mr. Kostin's general scheme using "shell

companies and nominal owners." Email Warrant at ¶¶ 18–22. The affidavit asserted that, based on

the FBI's investigation:

> Kostin used and still uses shell companies and nominal owners to obfuscate his true
> ownership of assets. Kostin purchases assets through trusted associates, places the assets
> into the ownership of shell companies, and relies on his trusted associates to manage and
> maintain the assets, which include superyachts and real property.

*Id.* ¶ 18. One such associate was Mr. Whyte, who the affidavit asserted was "connected to

numerous Kostin assets including a superyacht sold by Kostin in 2019 named the Motor Yacht

(M/Y) Ten and a multimillion-dollar home in Aspen, Colorado, among others." *Id.* ¶ 19. Second,

the affidavit asserted facts related to Mr. Kostin's and Mr. Whyte's "pattern and practice of hiding

his ownership of assets among several layers of fake, shell companies" related to the superyacht scheme. *Id.* ¶¶ 19–20. A second associate was identified as Christodoulos Vassiliades, who "works with Whyte and other facilitators by creating shell company after shell company that ultimately list Whyte, one of Whyte's assistants, Vassiliades, or an individual known to be affiliated with Vassiliades as the only actual person associated with the multiple layers of shell companies," including that used in relation to the yacht scheme. *Id.* ¶ 21. The affidavit then included three pages of factual allegations related to the superyacht scheme. *Id.* ¶¶ 23–33.

The affidavit included five paragraphs about the Aspen Home. *Id.* ¶¶ 34–35. The affidavit asserted that Mr. Kostin and his family listed the Aspen Home as their final destination when traveling to the United States. It stated that, in 2010, Mr. Whyte and Mr. Vassiliades "visited Aspen, Colorado, and met with individuals who would later represent 40 North Star, LLC, in the hopes of purchasing a home in Aspen." *Id.* ¶ 34(a). The affidavit also asserted that in 2019, after Mr. Kostin was sanctioned by OFAC, Mr. Wolfson "effectively purchased the interest in 40 North Star LLC." *Id.* ¶ 34(c). It stated, "[s]imilar to Whyte and Vassiliades's role as Kostin's shell owners and facilitators, Bond handled all communications involving Wolfson's purchase of the ownership interest in 40 North Star LLC and, by extension, the property located at that address in Aspen, Colorado. Wolfson indirectly paid Kostin approximately $12 million for the ownership of the property." *Id.* Finally, the affidavit asserted that the FBI had served "a subpoena on the managers of 40 North Star LLC for documents relevant to the ownership interest of the LLC, the transfer of that interest in 2019, and financial records after the date that Kostin was sanctioned." *Id.* ¶ 35. It stated that the "subpoena returns corroborate what the managers initially told the FBI—Wolfson purchased the interest in the LLC, effectively purchasing the home, for approximately $12 million in 2019 after Kostin was sanctioned." *Id.* ¶ 35.

At the hearing, Special Agent Lockridge identified several statements contained in the affidavit that were incorrect. She testified that she believed that the five paragraphs related to the Aspen Home were accurate when she swore out the warrant, but that she had since realized that some of her assertions were not accurate. Tr. 63:1-12. First, she recognized that the assertion that "Kostin and his family members frequently listed [the Aspen Home] as their final destination when traveling to the United States from 2010-2019," Email Warrant ¶ 34, was incorrect and should state "from 2010 to 2017." Tr. 63:13-20. She explained that the erroneous assertion that Mr. Kostin had traveled to the United States after 2017 was an error, based on incorrect travel records that inaccurately stated that Mr. Kostin traveled to Denver between 2017 to 2020 while the records should have stated that he traveled to Doha. Tr. 128:7-12. She did not mean to misrepresent the travel documents or mislead the court. Tr. 64:1-2. Second, the assertion that Mr. Bond owned a home in New York, Email Warrant ¶ 34(c), was incorrect because the New York property was actually a rental. Tr. 64:8-24.

Additionally, the assertion that "[f]rom 2010 to 2019 Whyte, Vassiliades, and their associates ensured that Kostin's name was never associated with the property as the owner, and they handled all communications involving Kostin's ownership of the home in Aspen," was partially incorrect. Email Warrant ¶ 34(b). While Mr. Klein reported that Mr. Whyte and Mr. Vassiliades were unwilling to "reveal the name of the client" in 2010, Mr. Klein never said that the Kostin associates intentionally concealed who the client was after the purchase was made. Tr. 95:9-21. Special Agent Lockridge therefore agreed that there was no "sustained effort" to conceal Mr. Kostin's ownership through 2019. *Id.* Other than those conceded inaccuracies, Special Agent Lockridge testified that she believed that the statements in the affidavit were factually accurate when she swore out the affidavit and remained so, Tr. 176:19–21, and she testified that she continued to believe that

Mr. Kostin owned the Aspen Home even after the United States government sanctioned him.  Tr. 176:14-18.

### B.    The Arrest and Questioning of Mr. Wolfson

The second witness to testify at the evidentiary hearing was Special Agent Chattaway.  He testified about the arrest and questioning of Mr. Wolfson.  The Government also introduced his body worn camera footage, which captured the interaction.  GX 18C; GX 19.  Special Agent Chattaway worked for a background investigation squad in the FBI's Washington D.C. field office at the time of the hearing.  Tr. 190:19-21.  In 2022, when Mr. Wolfson was arrested, Special Agent Chattaway was on a squad that investigated transnational organized crime.  Tr. 190:7-18.  He had worked at the FBI for 15 years.  Tr. 190:6.

The FBI arrested Mr. Wolfson at his home on February 22, 2024.  Tr. 191:4-8.  They had an arrest warrant.  Tr. 206:22.  They also had a search warrant, which authorized a search of Mr. Wolfson's home and electronic devices.  *See* Wolfson Premises Warrant; Tr. 195:15-16.  The Wolfson Premises Warrant permitted the FBI to compel Mr. Wolfson to provide his biometrics to unlock his devices.  GX at ECF page 22.  It expressly withheld the authority to compel Mr. Wolfson to provide his passcode.  *Id.*

The morning of the arrest, Special Agent Chattaway and several other agents arrived at Mr. Wolfson's home before 6:00 a.m.  Tr. 191:8-13.  Mr. Wolfson lived in Austin, Texas.  *Id.*  His house was large; Special Agent Chattaway described it as a mansion.  Tr. 191:15-17.  It was significantly larger than most other residences that Special Agent Chattaway had searched.  *Id.*  The weather that morning was clear, with temperatures in the mid-60s.  Tr. 191:22-24.

The agents had originally planned to call Mr. Wolfson and his wife on the phone to ask Mr. Wolfson to surrender voluntarily.  Tr. 192:9-14.  When neither answered, the agents resorted to their contingency plan:  knocking loudly on the door and calling out until someone answered.  *Id.*  The

agents did just that.  Tr. 192:9-24; GX 18C.  Several armed agents approached the door and

knocked.  GX 18C.  Someone other than Mr. Wolfson answered.  Tr. 192:24-25.  A few minutes

later, Mr. Wolfson came to the door wearing only boxer shorts.  Tr. 193:1-4.  One of the agents

immediately handcuffed Mr. Wolfson.  Tr. 193:5-7.  Mr. Wolfson was led away from the house,

down the front path, and into Special Agent Chattaway's custody.  Tr. 193:12-13; GX 18C.  Mr.

Wolfson and Special Agent Chattaway waited outside for about fifteen minutes while the other

agents secured the premises.  Tr. 193-94; GX 18C.

Once the residence was cleared and deemed secure, agents retrieved clothing for

Mr. Wolfson.  Tr. 200:10-16; GX 18C.  Special Agent Chattaway helped dress Mr. Wolfson.

Tr. 200:10-25–201:1-6; GX 18C.  Special Agent Chattaway was respectful and professional

throughout the interaction.  *Id.*  He calmly asked Mr. Wolfson to follow instructions, and Mr.

Wolfson complied.  While handcuffed, he stepped into pants held by Special Agent Chattaway.  *Id.*

Special Agent Chattaway put a shirt on Mr. Wolfson by removing one handcuff at a time.  *Id.*  He

slipped Mr. Wolfson's free arm through the sleeve of the shirt before placing the handcuffs back

on.  *Id.*  Once Mr. Wolfson was dressed, Special Agent Chattaway gently placed Mr. Wolfson into

the backseat of the law enforcement vehicle.  Mr. Wolfson's cuffed hands were behind him while he

remained seated.  Tr. 201:9-13; GX 18C.  Special Agent Chattaway, recognizing that "handcuffs are,

by nature, not meant to be comfortable," tried to make sure that Mr. Wolfson "was as comfortable

as possible given the circumstances."  *Id.*  For example, he moved the front seat forward to give Mr.

Wolfson more space.  Tr. 202:4-5.  Special Agent Chattaway also calmly explained to Mr. Wolfson

that the physical discomfort was temporary, stating, "Let's get you to the next destination and we

will get you in a more comfortable position."  Tr. 202:14-23; GX 18C.  Special Agent Chattaway

thought that Mr. Wolfson "was probably in mild discomfort," but he was cooperative and "I think

he chuckled at one point." Tr. 201:19-22. During the arrest, Mr. Wolfson appeared lucid and calm, particularly as compared to others that Special Agent Chattaway had arrested. Tr. 216:12-16.

Special Agent Chattaway stepped away from Mr. Wolfson to talk to another agent. That agent asked Special Agent Chattaway if he "wanted to interview [Mr. Wolfson] about the substance of the case," and ask for his passcode. Tr. 204:1-11. Special Agent Chattaway replied that he did not intend to interview Mr. Wolfson about the substance of the case. Tr. 204:1-4. He did, however, plan to ask Mr. Wolfson for his passcode. Tr. 204:10-11.

Special Agent Chattaway did not know that the warrant expressly prohibited him from compelling Mr. Wolfson to provide his passcode. He thought that he was permitted to ask "pedigree" questions, which he incorrectly believed included asking for the passcode. Tr. 197:9-11.[21] He also believed that he "could ask for the passcode to his phone in order to execute the search warrant." *Id.* He had "witnessed other FBI agents and agents of other agencies, [like] local police, asking other people who had been arrested for their passcode," and thought he could do the same. Tr. 197:9-16. Special Agent Chattaway conceded at the hearing, however, that "this belief is incorrect." *Id.*

Because of this incorrect belief, Special Agent Chattaway returned to Mr. Wolfson and asked about his passcode. With Mr. Wolfson still seated and handcuffed in the car, Special Agent Chattaway stood in the open doorway and said, "We have a search warrant for your phone." Tr. 204:24-25; GX 19. Mr. Wolfson immediately responded that his phone was in his bedroom. Tr. 205:1-4. Special Agent Chattaway asked, "Is it facial recognition?" and Mr. Wolfson responded, "Yes." Tr. 205:11-16. Special Agent Chattaway followed up, "And there is a passcode as well?" *Id.* Mr. Wolfson did not answer with a yes or a no but rather blurted out part of his passcode.

---

[21] "'[P]edigree' questions that pertain to administration or a defendant's basic identification information do not trigger *Miranda.*" *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017).

Tr 205:15-17; GX 19.  Special Agent Chattaway also told him, "We have a search warrant for your phone and three paintings."  *Id.*  This confused Mr. Wolfson.  *Id.*  Mr. Wolfson asked what he meant by "the paintings," so Special Agent Chattaway explained that he had a search warrant for three paintings "that we knew had been in the 40 North Star house in Aspen, Colorado."  Tr. 207:9-12. Special Agent Chattaway spoke calmly.

Special Agent Chattaway then called over another FBI agent to be a witness for the *Miranda* advice of rights process.  Tr. 208:1; GX 19.  He began reading the *Miranda* warnings to Mr. Wolfson in English.  Mr. Wolfson spoke English, so although Special Agent Chattaway had the *Miranda* form printed in Russian, he did not use it.  Special Agent Chattaway thought that Mr. Wolfson had said, at one point, that he was comfortable with the advice of rights being read to him in English. Tr. 215:1-3.  Special Agent Chattaway also knew that Mr. Wolfson was intelligent—he "was an accomplished, smart, and successful banker and businessman in Russia"— so he felt comfortable proceeding in English.  Tr. 217:2-12.  Wolfson asked for his glasses, but they were not provided. 248:3-10.

Before completing the *Miranda* rights process, Special Agent Chattaway gave the passcode that Mr. Wolfson had "blurted out" previously to another agent.  Tr. 205:17.  That agent tried to unlock the phone, but realized that the passcode was incomplete and told Special Agent Chattaway. Special Agent Chattaway asked Mr. Wolfson for the correct, six-digit passcode.  Tr. 211:4-9. Mr. Wolfson answered.  *Id.*  The time was around 6:20 a.m.; Mr. Wolfson had been in custody for about twenty minutes by then.  Tr. 212:24.  Special Agent Chattaway turned off his body worn camera, which he explained was because "the body worn camera was only supposed to run for the length of the operation."  Tr. 213:22-25.  Special Agent Chattaway testified that he completed the full *Miranda* warnings "after he provided the passcode."  Tr. 213:14-18.

## III.   DISCUSSION

### A.   Mr. Wolfson's and Mr. Bond's Motion to Suppress the Fruits of the Email Warrant is Granted

Because Special Agent Lockridge omitted several material facts from the Email Warrant in reckless disregard for their truth, Mr. Wolfson's and Mr. Bond's motion to suppress the fruits of the Email Warrant is granted.  "The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Lauria*, 70 F.4th 106, 120 (2d Cir. 2023); U.S. Const. amend. IV.  "Searches conducted pursuant to such warrants are presumptively reasonable." *Lauria*, 70 F.4th at 120 (citing *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017)).  "Nevertheless, where the presumption is overcome, even evidence obtained pursuant to a warrant can be suppressed." *Id.*

"The Supreme Court [in *Franks v. Delaware*] held that where a search is conducted pursuant to a judicially authorized warrant, a 'presumption of validity' obtains 'with respect to the affidavit supporting the search warrant.'" *Id.* at 124 (citing *Franks*, 438 U.S. at 171).  "To overcome that presumption, a defendant must, 'make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* (quoting *Franks*, 438 U.S. at 155–56).  "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.*

At the *Franks* hearing, "[the defendant] must establish falsity, knowledge, and materiality 'by a preponderance of the evidence.'" *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023); *see also United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) ("To void the warrant and suppress the evidence, a defendant must demonstrate, by a preponderance of the evidence, that (1) the affidavit contained 'a false statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'").

With respect to the first prong—falsity—"the burden is on a defendant to demonstrate that a specific statement or detail is false." *See United States v. Lahey*, 967 F. Supp. 2d 698, 716 (S.D.N.Y. 2013); *see also Sandalo*, 70 F.4th at 85 (explaining that, at the *Franks* hearing, a defendant "must establish falsity, knowledge, and materiality 'by a preponderance of the evidence.'"). "Whether the statement was true or false, and whether the affidavit was complete or incomplete, are questions of fact[.]" *United States v. Lambus*, 897 F.3d 368, 397 (2d Cir. 2018).

With respect to the second prong—knowledge—the Second Circuit has explained that, "a defendant's motion to suppress must be denied 'unless the misrepresentations . . . were intentional or deliberate, or were made in reckless disregard for the truth." *Lauria*, 70 F.4th at 131 (citing *Lambus*, 897 F.3d at 399). Misstatements resulting from "negligence or innocent mistake do not warrant suppression." *Id.* (alteration and internal quotation marks omitted).

"This inquiry, which looks to the mental states of mind of government officials, is said to be a 'subjective' test rather than an 'objective' one." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013). "[T]he reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* at 154. "As [the Second Circuit] has said: 'An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'" *Id.* "However, every decision not to include certain information in the affidavit is

'intentional' insofar as it is made knowingly.  If . . . this type of 'intentional' omission is all that *Franks* requires, the *Franks* intent prerequisite would be satisfied in almost every case[.]"  *Id.* "[Rather,] *Franks* protects against omissions that are *designed to mislead,* or that are made in *reckless disregard of whether they would mislead,* the magistrate."  *Id.* (alterations in original) (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)).

   "To prove reckless disregard for the truth, the defendants [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations."  *Id.* (alterations in original) (quoting *United States v. Whitley,* 249 F.3d 614, 621 (7th Cir. 2001)).  "Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations."  *Id.*  "Of course, the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information[.]"  *Id.* (emphasis in original).  "Subjective intent, after all, is often demonstrated with objective evidence."  *Id.*  "But such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information . . . ."  *Id.* at 154–55.

   As to the third prong—materiality—the Second Circuit has described that, "[t]o determine whether misstatements are 'material,' a court must 'set[ ] aside the falsehoods' in the application, and determine '[w]hether the untainted portions [of the application] suffice to support a probable cause [] finding."  *Rajaratnam*, 719 F.3d at 146 (internal citations omitted).  "If the untainted portions of the application are sufficient to support the probable cause [] findings, then the misstatements are not 'material' and suppression is not required."  *Id.*  "Although omissions 'are governed by the same rules' as misstatements, 'the literal Franks approach [does not] seem[] adequate because, by their nature, omissions cannot be deleted'; therefore '[a] better approach . . . would be to . . . insert the omitted truths revealed at the suppression hearing[.]"  *Id.* (internal citations omitted and alterations in original); *see also Lahey*, 967 F. Supp. 2d at 711 ("[I]n the context of omissions, courts 'insert the

omitted truths' into the hypothetical corrected affidavit."). "[I]n the context of a criminal case, a warrant affidavit may be corrected by supplementation only when the supplemental information detracts from, rather than supports, probable cause." *Lauria*, 70 F.4th at 126.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *accord United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "This standard does not demand 'hard certainties,' but it does require more than a 'hunch,' the latter being insufficient to support even an investigative stop." *Lauria*, 70 F.4th at 128 (internal citations omitted) (explaining that probable cause is a "'practical,' 'common-sensical,' 'all-things-considered' standard for assessing probabilities in particular factual context") (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). In the *Franks* context, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause . . . ." *Rajaratnam*, 719 F.3d at 146 (alterations in original).

### 1. The *Franks* Hearing Revealed That the Email Warrant Contained Several Misstatements and Omitted Truths

The Court begins by constructing a hypothetical affidavit in which it corrects misstatements and "insert[s] the omitted truths revealed at the suppression hearing[.]" *See Rajaratnam*, 719 F.3d at 146; *see, e.g.*, *Lahey*, 967 F. Supp. 2d at 717, 730 (beginning by constructing a hypothetical affidavit by correcting the misrepresentations and inserting the omitted truths supported by the evidence at the *Franks* hearing).

First, the assertion in the affidavit that "Kostin and his family members frequently listed [the Aspen Home] as their final destination when traveling to the United States from *2010-2019*" is incorrect.  Email Warrant ¶ 34 (emphasis added).  Special Agent Lockridge's understanding that Mr. Kostin traveled to the United States after 2017 was based on incorrect travel documents.  The travel records erroneously stated that Mr. Kostin traveled to Denver between 2017 to 2020 when Mr. Kostin had actually traveled to Doha, Qatar.  Tr. 128:7-12.  The assertion that Mr. Kostin traveled to the United States after 2017 is therefore inaccurate.  The Government concedes this point. Tr. 285:1-5.

The Court "correct[s] the affidavit[] by deleting" the erroneous date.  *See Lauria*, 70 F.4th at 127 (correcting an erroneous assertion that toll records reflected data from February 19*, 2019, when the "records in fact pertain[ed] to February 15, 2019" not by swapping the wrong day, the 19th, with the correct day, the 15th, but by deleting the incorrect reference to the 19th altogether, "leaving only the correct month and year."); *see also id.* (similarly concluding that to correct a separate assertion that a robbery occurred on the incorrect date that "[w]e do not substitute the actual robbery date for the misstated one.  Rather, we delete the erroneous day of the month from the affidavits, leaving only the correct statement that the [robbery] occurred in February 2019.").  Here, as in *Lauria*, the Court corrects the assertion that Mr. Kostin "frequently traveled to the United States from 2010-2019," not by inserting the correct endpoint, namely 2010-2017, but by deleting the incorrect reference to 2019 altogether, leaving only the correct starting year, 2010.[22] Additionally, with respect to the frequency of the family's travel in 2010, Mr. Kostin's wife traveled to the Aspen Home once that year.  Tr. 23:17-17.  Mr. Kostin did not visit at all in 2010.

---

[22] The Court also changes the preposition "*from* 2010" to "in 2010," as in *Lauria*, in which the court changed the incorrect assertion that a robbery "*occurred on* February 19, 2019" to assert that the robbery "occurred *in* February 2019."  *See Lauria*, 70 F.4th at 127.

Tr. 21:19-21.  The fully corrected assertion should therefore read:  "*Kostin's family member* listed [the Aspen Home] *once* as their final destination when traveling to the United States *in 2010*."

Second, the assertion that Mr. Bond "owns homes in both Oregon and New York" is inaccurate.  Email Warrant ¶ 34(c).  The assertion that Ms. Bond owned a home in New York is incorrect because the New York property was actually a rental.  Tr. 64:8-24.  This incorrect fact must be set aside.  The sentence should read:  "Bond is a U.S. citizen who owns *a home in Oregon*."

Third, the Court deletes the erroneous parts of the assertion that "[f]rom 2010 *to 2019*, Whyte, Vassiliades, and their associates ensured that Kostin's name was never associated with the property as the owner, and *they handled all communications* involving Kostin's ownership of the home in Aspen."  Email Warrant ¶ 34(b) (emphasis added).  This assertion calls for two corrections.  First, Special Agent Lockridge conceded that there was no "sustained effort" to conceal Mr. Kostin's ownership from 2010 through 2019.  Tr. 95:17-21.  Mr. Klein reported only that Mr. Whyte and Mr. Vassiliades were unwilling to reveal their client's name in 2010; he never said that they deliberately concealed the client's name *after* 40 North Star purchased the Aspen Home in 2010.  Tr. 95:14-21.  In fact, Mr. Whyte "faded away" completely after 2010.  Tr. 146:11-15.  Second, it is not true "that Whyte and Vassiliades handled all communications involving Kostin's ownership of the home" from 2010 through 2019.  Rather, the records indicate that Special Agent Lockridge was aware that, in 2018, Mr. Bond became the authorized representative for 40 North Star.  He was expressly responsible for handling its business correspondence.  GX 14 (January 11, 2018 email to Mr. Klein); Tr. 58:1-19.  Additionally, neither Mr. Klein nor Ms. Tanguay reported that Mr. Kostin was involved with the property after 2018.  Tr. 146:3-9.  Therefore, the Court must correct the assertions that, from 2010 *to 2019,* Mr. Kostin's associates concealed his identity as owner and handled *all communications* involving his ownership.  Neither assertion is true with respect to the year 2019.  The Court deletes the erroneous date, "leaving only the correct . . . year."  *See Lauria*, 70 F.4th

at 127. The statement should read: "*In 2010*, Whyte, Vassiliades, and their associates ensured that Mr. Kostin's name was never associated with the property as the owner, and they handled all communications involving Mr. Kostin's ownership of the home in Aspen." Email Warrant ¶ 34(b).[23]

Fourth, the Court must "insert the omitted truths revealed at the suppression hearing," *Rajaratnam*, 719 F.3d at 146. Several were revealed. The Court first adds the omitted truth that the FBI had information that the ownership of 40 North Star changed several times between 2010 and 2014. Specifically, in 2010, an entity called Soltrop owned 40 North Star, which was sold to a company called Ledridge in 2013. Tr. 110:3-8. In 2014, Ledridge sold 40 North Star to Altamonte. *Id.* Special Agent Lockridge knew about each of these transactions when she swore out the Email Warrant. *Id.* The Court inserts this chain of transactions.

Next, the Court inserts the omitted truth that the FBI learned from counsel for 40 North Star in a response to a subpoena that Mr. Wolfson owned Altamonte. *See* Tr. 123:16-19; Turner Smith Email. Special Agent Lockridge had read the email and knew of this fact prior to swearing out the Email Warrant. Tr. 122: 23-24.[24]

Additionally, the Court inserts the omitted fact that the FBI understood that, in 2019, Mr. Wolfson purchased 40 North Star *from Altamonte*. Tr. 33:1-35:5. Mr. Klein reported this fact during his September 9, 2022 interview. Tr. 33:22-25–34:1-2. The Smith Production corroborates it, too. For example, the 2019 Bond Email expressly states that Mr. Wolfson "purchased from Altamonte 100% shares of 40NS." *See* 2019 Bond Email at 2. Based on this omitted truth, the Court must also

---

[23] Again, the Court also changes the preposition "*from* 2010" to "*in* 2010," as in *Lauria*, 70 F.4th at 127.

[24] For example, the following exchange occurred at the hearing:

Q.    You didn't put it in there that you had been informed through the subpoena returns that Wolfson owned Altamonte; correct?

A.    Correct.

Tr. 123:16-19.

correct the assertion that "[t]he subpoena returns corroborate what the managers initially told the FBI—Wolfson purchased the interest in the LLC, effectively purchasing the home for approximately $12 million in 2019 after Kostin was sanctioned." Email Warrant ¶ 35. This sentence should actually state: "The subpoena returns corroborate what the managers initially told the FBI— Wolfson effectively purchased the home *from Altamonte* for approximately $12 million in 2019 after Kostin was sanctioned."[25]

Fifth, with the omitted truth revealed that Mr. Wolfson bought 40 North Star from Altamonte, the Court must correct the misstatement that "Wolfson indirectly *paid Kostin* approximately $12 million *for the ownership of the property*" in 2019." Email Warrant ¶ 34(c). This sentence is misleading for two reasons. First, it incorrectly suggests that Mr. Wolfson bought the property from Mr. Kostin, rather than from Altamonte. Second, it misleadingly omits the fact the $12 million payment was actually made to CapitalInvest as part of a documented settlement agreement between Altamonte, Mr. Wolfson, and CapitalInvest.[26] This omission is misleading because the payment was not made directly to Mr. Kostin; it was made pursuant to the terms of a loan agreement to a separate, arguably distinct entity from Mr. Kostin. While the original affidavit asserts that Mr. Wolfson "indirectly" paid Mr. Kostin the $12 million, the sentence as written withholds the full context of the 2019 transaction, creating the false impression that Mr. Wolfson paid $12 million to Mr. Kostin *to buy the property from him*. Consequently, the assertion "Wolfson

---

[25] As modified, this assertion is correct. As noted above, a number of documents contained in the Smith Production demonstrate that the transfer of 40 North Star to Mr. Wolfson in 2014 and that the transfer in 2019 was a repayment of a loan to CapitalInvest. The subpoena documents do not, therefore, fully corroborate the impression that the affidavit was designed to leave, namely that the records corroborated that Mr. Wolfson purchased 40 North Star from Mr. Kostin in 2019.

[26] The 2019 Bond Email makes this clear. It details the 2019 transaction, summarizing that Mr. Wolfson paid $12 million to CapitalInvest, which settled Altamonte's loan obligation to CapitalInvest from 2014, in exchange for Mr. Wolfson taking direct ownership of 40 North Star from Altamonte. *See* 2019 Bond Email. Special Agent Lockridge had the settlement agreement between CapitalInvest, Altamonte, and Mr. Wolfson. She confirmed that she "knew that there was a purchase and loan agreement in 2014," and that "the money in 2019 went to an entity called CapitalInvest." Tr. 137:10-16.

indirectly paid Kostin approximately $12 million" should read: "Wolfson paid approximately $12 million to an entity called CapitalInvest pursuant to a loan settlement agreement between Altamonte, Mr. Wolfson, and CapitalInvest."[27]

At bottom, the hearing ultimately revealed that the FBI was aware of a material change in the ownership of 40 North Star after Mr. Kostin's purchase in 2010. Although he purchased 40 North Star through a shell company in 2010, he sold 40 North Star to Altamonte in 2014. Because the hearing revealed that Mr. Kostin's entity sold 40 North Star in 2014, the Court deletes the following assertion: "The FBI's investigation has revealed that Kostin likely owned real property in the U.S. until at least 2019." Email Warrant ¶ 34. The FBI did not include specific facts that supported that inference because the documents did not provide a basis to conclude that Mr. Wolfson was a straw purchaser for Mr. Kostin; nor did they disclose a role by an entity associated with Mr. Kostin prior to Mr. Wolfson's repurchase of 40 North Star.

As corrected, the hypothetical affidavit would read as follows, with changes identified in italics:

1. *Kostin's family member* listed [the Aspen Home] *once* as their final destination when traveling to the United States *in 2010*. Open-source documents show that the home at that address was sold in June 2020. Subpoena returns from the title company associated with that sale show that the seller at the time was "40 North Star, LLC." Representatives[28] of

---

[27] The Court sets aside the first part of the sentence—that "Wolfson indirectly paid Mr. Kostin"—because that clause, together with the omitted facts about Mr. Wolfson's payment to CapitalInvest, could be read to support probable cause. Of course, the Court does not add then-known, incriminating fact that the FBI believed that Mr. Kostin controlled CapitalInvest because "a warrant affidavit may be corrected by supplementation only when the supplemental information detracts from, rather than supports, probable cause." *See Lauria*, 70 F.4th at 126–127. "[A]n affidavit with knowing falsehoods in it . . . should not be open to rehabilitation by a process of substituting for the affiant's lies other information that is really the truth from which he deliberately departed." *Id.* at 126. Here, the Court corrects the sentence to include the complete context of the 2019 transaction—namely, that it was not to purchase the house from Mr. Kostin, and included a payment to an arguably unrelated entity called CapitalInvest.

[28] Mr. Bond objects to the description of Ms. Tanguay and Mr. Bond as "representatives" of 40 North Star, but this characterization is not false or misleading. Mr. Bond argues that the word "representatives" is incorrect because Mr. Tanguay, as the property manager, was not an authorized representative of 40 North Star. Ms. Tanguay, who handled tasks like ensuring that the house was clean and stocked with food, and was not a "legal representative of the house." Tr. 147-148. But the affidavit does not say "legal" representative. It was reasonable for Special Agent Lockridge to use the word "representative" to apply to a person who is a representative of a property. "All storytelling involves an

40 North Star told the FBI that:

    a.   In 2010, two of Kostin's most trusted associates, Whyte and Vassiliades, identified above, visited Aspen, Colorado, and met with individuals who would later represent 40 North Star, LLC, in the hopes of purchasing a home in Aspen. Whyte and Vassiliades refused to name Kostin as the actual interested party but indicated that their boss was very wealthy and he wanted to buy a home in Aspen.

    b.   *In 2010,* Whyte, Vassiliades, and their associates ensured that Kostin's name was never associated with the property as the owner, and they handled all communications involving Kostin's ownership of the home in Aspen.

2. *The FBI also learned the following information in the course of its investigation:*

    a.   *Ownership of 40 North Star changed several times between 2010 and 2014. In 2010 an entity called Soltrop owned 40 North Star. In 2013, Soltrop was sold to a company called Ledridge. In 2014, 40 North Star was sold from Ledridge to an entity called Altamonte.*

    b.   *Counsel for 40 North Star, in response to a subpoena, informed the FBI that Mr. Wolfson owned Altamonte.*

    c.   In 2019, after Kostin was sanctioned by OFAC, Wolfson effectively purchased the interest in 40 North Star LLC *from Altamonte. Wolfson paid approximately $12 million to an entity called CapitalInvest pursuant to a loan settlement agreement between Altamonte, Mr. Wolfson, and CapitalInvest.*

    d.   Wolfson is a Russian national who currently resides in the U.S. on a visa. Wolfson was represented in this transaction by an individual named Gannon Bond ("Bond"). Bond is a U.S. citizen who owns *a home in Oregon.* Similar to Whyte and Vassiliades's role as Kostin's shell owners and facilitators, Bond handled all communications involving Wolfson's purchase of the ownership interest in 40 North Star LLC and, by extension, the property located at that address in Aspen, Colorado.

3. The FBI served a subpoena on the managers of 40 North Star LLC for documents relevant to the ownership interest of the LLC, the transfer of that interest in 2019, and financial records after the date that Kostin was sanctioned. The subpoena returns corroborate what the managers initially told the FBI—Wolfson purchased the interest in the LLC *from Altamonte,* for approximately $12 million in 2019 after Kostin was sanctioned.

---

element of selectivity," and the reasonable use of the word representative was not misleading. *See Lahey,* 967 F. Supp. 2d at 708.

### 2.   Special Agent Lockridge Made Misrepresentations and Omitted Facts in Reckless Disregard for the Truth

Special Agent Lockridge made material misstatements and omitted material facts in reckless disregard of the truth because she consciously omitted clearly critical facts—namely, that the ownership of 40 North Star changed several times after Mr. Kostin initially purchased it in 2010—to present a persuasive—but incomplete—picture of the investigation's results.

At the outset, two of Special Agent Lockridge's conceded misstatements were not made recklessly.  First, the erroneous assertion that Mr. Kostin listed the Aspen Home as his final destination when traveling to the United States through 2019 was an "innocent mistake."  *See Lauria*, 70 F.4th at 131.  Special Agent Lockridge testified credibly that she obtained inaccurate travel records that incorrectly stated that Mr. Kostin traveled to Denver between 2017 to 2020 when in fact Mr. Kostin had traveled to Doha.  Tr. 128:7-12.  When she swore out the affidavit, she did not know the records were wrong.  *Id.;* Tr. 62:14-23.  She credibly testified that he did not mean to misrepresent the travel documents or mislead the court.  *Id.*  Although perhaps unlikely that Mr. Kostin would be let into the United States post-sanctions, Special Agent Lockridge honestly conveyed the information she had based on government records at the time.  There is no indication that she made this misstatement intentionally or in reckless disregard for the truth.  Second*,* the misstatement that Mr. Whyte and Mr. Vassiliades ensured Mr. Kostin's name was never associated with the property as the owner from 2010 to 2019, Email Warrant ¶ 34(b), was also not made in reckless disregard for the truth.  In 2010, Mr. Klein reported that Whyte and Vassiliades were unwilling to "reveal the name of the client" in 2010.  Tr. 94:1-3.  Special Agent Lockridge "implied" (inferred) based on their initial intention to conceal their wealthy client in 2010 that the concealment "continued on" for nine more years.  Tr. 97:9-11.  Special Agent Lockridge perhaps "exercised poor judgment" in extrapolating this conclusion, but that "would, at best, support a claim of negligence.

[And], such a finding . . . [does] not get [the defendants] over the first *Franks* hurdle" as to this assertion. *See Lahey*, 967 F. Supp. 2d at 710 (alterations in original).

Otherwise, however, Special Agent Lockridge consciously omitted several critical facts, if not intentionally to mislead, then at the very least "in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154. These omissions include that: (1) ownership of 40 North Star changed several times between 2010 and 2019, including Altamonte's 2014 purchase, (2) the FBI had information that Mr. Wolfson owned Altamonte, and (3) Mr. Wolfson's $12 million payment was a loan repayment made to CapitalInvest.[29] Recklessness can be inferred with respect to each omission not only because of the clearly critical nature of the omissions but also because she consciously decided to omit critical facts in order to present a particular, but incomplete picture.

For example, the Court infers that Special Agent Lockridge recklessly omitted the fact that Mr. Kostin's special purpose vehicle sold 40 North Star in 2014 because the fact is critical to the issue of whether Mr. Wolfson's purchase in 2019 violated sanctions, and because she consciously omitted the information. *See Rajaratnam*, 719 F.3d at 154 ("the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information[.]"). Indeed, the purpose of the FBI's investigation was to figure out "who owned the Aspen Home and when." Tr. 116:9-12; 117:7-21. There is no dispute that Special Agent Lockridge knew about the changes in ownership of 40 North Star from Soltrop to Ledridge, and Ledridge to Altamonte. Tr. 48:1-14; Tr. 110:1-8. She conceded that she consciously omitted Altamonte's 2014 purchase of 40 North Star from the Email Warrant because she did not think it was "significant enough" to include. Tr. 108:18-25–109:1-16. This is a problem because the Government's entire theory of probable cause at the time hinged on

---

[29] As explained above, the inclusion of CapitalInvest in this warrant is helpful to Mr. Wolfson because it demonstrates that his $12 million payment in 2019 was made to an entity that is arguably distinct from Mr. Kostin, given that the Email Affidavit did not include any facts linking CapitalInvest to Mr. Kostin. Additionally, that the payment related to a 2014 loan agreement between Altamonte and CapitalInvest demonstrates that the payment was not made to purchase the home from Mr. Kostin.

Mr. Kostin's continued ownership of 40 North Star. By consciously excluding the then-known truth that ownership of 40 North Star actually changed several times after Mr. Kostin purchased it in 2010, the affidavit presents a misleading narrative.

Special Agent Lockridge also recklessly omitted the critical fact that counsel for 40 North Star told her that Mr. Wolfson owned Altamonte. Tr. 102:16-24.[30] Special Agent Lockridge had received Mr. Smith's email containing the fact that Mr. Wolfson owned Altamonte, and "remembered not putting that information in the warrant." Tr. 123:7–124:6. Special Agent Lockridge testified as follows:

> Q:   What you read was the email that Turner Smith had sent you.
> A:   Correct.
> Q:   And you remember reading that.
> A:   Yes.
> *Q:   All right. And you remember not putting that information in the warrant; correct?*
> *A:   Not putting his – the statement –*
> *Q:   The 2014 transaction. You didn't put that in there.*
> *A:   Correct. Correct.*
> *A:   You didn't put it in there that you had been informed through the subpoena returns that Wolfson owned Altamonte; correct?*
> *A:   Correct.*
> Q:   And you didn't put in that, in 2014, Altamonte bought the shares; correct?
> A:   Correct.
> Q:   All right. What you did put in was that in 2010 it was your view, based on your Investigation, that Kostin bought it; right?
> A:   Yes.
> Q:   And then what you put in was in 2019, Wolfson bought it; right?
> A:   Yes.

---

[30] When asked about this, Special Agent Lockridge answered as follows:

> Q.   And as of October 14, prior to your October 21 warrant affidavit, you had been in receipt of the representation from Turner Smith that Mr. Wolfson owned Altamonte.
> A.   We did. However, we started drafting that search warrant application prior to that time.
> Q.   And you didn't include the fact that Mr. Wolfson, through Altamonte, purchased 100 percent interest in the house –
> A.   We did not.

Tr. 102:16-24.

Tr. 123:7–124:6 (emphasis added). Special Agent Lockridge consciously considered and chose not to include the critical fact that she had information that Mr. Wolfson indirectly purchased 40 North Star in 2014. *Compare Rajaratnam*, 719 F.3d at 155 (finding no reckless disregard for the truth when the affiant testified that the omitted fact "never occurred to [her], never crossed [her] mind to put a section in [the wiretap application]") (alterations in original). Of course, this fact is also critical because if Mr. Wolfson's company bought 40 North Star in 2014, then he did not buy it from Mr. Kostin in 2019. Similarly, Special Agent Lockridge was aware of the fact that the money paid in 2019 from Mr. Wolfson was a repayment of a loan *to CapitalInvest*, but did not include that fact in the affidavit. Tr. 135:21-25–136:1-7. Although the $12 million payment in 2019 underpins the alleged sanctions violation, Special Agent Lockridge did not include critical facts that demonstrated *who* received the $12 million payment: CapitalInvest, not Mr. Kostin.

The clearly critical nature of each of these omissions, combined with Special Agent Lockridge's testimony about why each fact was omitted, "leads the Court to find that recklessness is to be inferred." *See e.g.*, *Lahey*, 967 F. Supp. 2d at 723–24 (citing *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (inferring recklessness, where the affiants "fail[ed] to provide *all* potentially adverse information"))). There also is the "obviously problematic fact" that "each of the related omissions" in the affidavit "drive in the same direction: establishing a connection . . . [that] the fuller evidence did not support." *Lahey*, 967 F. Supp. 2d at 723–24. Here, each omission removes a link from the chain that connects Mr. Wolfson to Mr. Kostin, drawing the men closer together. The "fuller evidence," with the omitted facts, demonstrates a far more tenuous connection between Mr. Kostin's 2010 purchase of the home and Mr. Wolfson's direct ownership in 2019. Even if "the omission of each individual fact may not necessarily lead to the conclusion that [the affiant] acted with reckless disregard for the truth, the cumulative effect of all of the omissions was to eliminate nearly every indicator detracting from [probable cause]." *Id.* (alterations in original). And in this

regard, this case is distinguishable from *Rajaratnam,* where "it [was] clear that fully disclosing [the omitted information] would only have *strengthened* the . . . application[]." *Id.* (citing *Rajaratnam,* 719 F.3d at 155 (emphasis in original)).  At bottom, the conclusion that Special Agent Lockridge recklessly omitted facts from her affidavit is based on the totality of the evidence.  It is not solely, or even primarily, because the omitted information was "clearly critical."  Rather, Special Agent Lockridge consciously omitted select facts, which resulted in the presentation of an incomplete picture of the investigation's results to the magistrate.

The Court does not agree with the argument advanced by the Government at oral argument that Special Agent Lockridge did not omit Mr. Wolfson's ownership of Altamonte in reckless disregard for the truth because it was an "unsubstantiated" assertion by a lawyer who also represented Mr. Wolfson and Mr. Bond at the time.  Mr. Smith responded to the subpoena addressed to Mr. Klein in his capacity as the legal representative of 40 North Star.  Mr. Smith expressly told Special Agent Lockridge that "the documents circa 2010 to April 2014 are from a time prior to Mr. Wolfson's purchase of the membership interest in 40 North Star LLC (through an entity named Altamonte Holdings Limited" around April 2014.  Turner Smith Email at 2.  During the hearing, Special Agent Lockridge agreed that the documents produced by Mr. Smith "were very likely to be very important documents," and that they did, in fact, include important documents relevant to her investigation.  Tr. 119:5-18.  But she did not hone in on the documents' impact on the most critical question in the investigation:  who owned 40 North Star and when.  Tr. 120:11-16. Special Agent Lockridge therefore only credited and included the inculpatory facts, but "fail[ed] to provide *all* potentially adverse information" in reckless disregard of whether such a presentation would mislead the magistrate.  *See Lahey*, 967 F. Supp. 2d at 723–24.

Indeed, although the inference of recklessness is sufficient for Mr. Wolfson and Mr. Bond to meet their burden under *Franks*, other evidence supports the view that the special agent intentionally

designed the language in the affidavit to obscure known facts that contradicted the preferred

narrative.  Special Agent Lockridge edited the affidavit on October 19, 2022, just days after receiving

the Turner Smith Email.  Although the draft of the affidavit originally read, "In 2019, after Kostin

was sanctioned by OFAC, Kostin's interest in 40 North Star LLC was transferred to Vadim

Wolfson;" she edited the sentence to instead read, "In 2019, after Kostin was sanctioned by OFAC,

Vadim Wolfson ("Wolfson") *effectively purchased the interest in 40 North Star LLC.*"  Tr. 180:17-21;

Email Warrant ¶ 34(c) (emphasis added).

       This intentional use of the word "effectively" is highly probative of Special Agent

Lockridge's state of mind.  *See Lauria*, 70 F.4th at 125–132.  The deletion of the assertion that Mr.

Kostin's interest in 40 North Star was transferred, combined with the insertion of the word

"effectively" to couch the 2019 transaction, suggests that Special Agent Lockridge knew that she

could not honestly assert that Mr. Wolfson purchased Mr. Kostin's interest in 40 North Star in 2019.

As revised, the statement in the affidavit did not assert that Mr. Wolfson purchased the asset from

Mr. Kostin in 2019 at all.  Such a characterization, without mentioning the break in ownership in

2014—would not be accurate based on the information known to the agent the time.  The words

"effectively purchased," however, were consistent with the factual narrative described in the Smith

Production—namely that Mr. Wolfson "effectively purchased" the shares of 40 North Star directly

that he had previously owned indirectly.  That Special Agent Lockridge believed it necessary to craft

the language of the affidavit in this careful way indicates that she had "reasons to doubt the veracity

of the allegations" that Mr. Wolfson purchased Mr. Kostin' interest in 40 North Star in 2019.  *See*

*Rajaratnam*, 719 F.3d at 154.

       The Court does not believe that Special Agent Lockridge lied.  Her edits to the affidavit in

the drafting process make clear, however, that the characterization of the straightforward story told

in the affidavit—that Mr. Kostin continuously owned 40 North Star without any breaks in

ownership, with no reference to Altamonte's purchase in 2014, and that Mr. Wolfson's $12 million

payment in 2019 was made to Kostin to buy the property—was made at least "in reckless disregard

of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154.  Consequently, based on the totality of

the evidence, the Court finds that the affidavit contained material misstatements and omitted

material facts in reckless disregard of the truth.  This conclusion is based on the totality of the

evidence, not solely or primarily because the omitted information was clearly critical but also based

on the evidence that Special Agent Lockridge edited the affidavit to present a particular, incomplete

picture of the investigation's results.

> ### 3.  The Misstatements and Omissions Contained in the Email Warrant
> ### Are Material

Finally, the misstatements and omissions contained in the Email Warrant are material

because the remaining "untainted portions" of the corrected affidavit do not support a finding of

probable cause.  *See Rajaratnam*, 719 F.3d at 146.[31]  The uncorrected Email Warrant established

probable cause to believe that the defendants violated IEEPA because it asserted that Mr. Kostin

owned property inside the United States after he was sanctioned, and sold that blocked property to

Mr. Wolfson in 2019.  Mr. Kostin's continuous ownership of 40 North Star from 2010 through

2019 was, therefore, critical to the Email Warrant's theory of probable cause.  However, the

corrected affidavit reveals that Mr. Kostin did not singularly own 40 North Star during that time

period.  The break in Mr. Kostin's ownership after 2010 defeats the Email Warrant's only theory of

probable cause absent other allegations of sanctions violations.

As corrected, the affidavit asserts that Mr. Kostin sold 40 North Star to Altamonte in 2014,

before OFAC imposed any sanctions.  Each fact that supports this conclusion is material:  that

---

[31] The assertion that Mr. Bond owned a home in New York is not material.  *See* Email Warrant ¶ 34(c).  Nothing about the Aspen Home relates to New York or Mr. Bond's home ownership.  That Mr. Bond does not own property in New York has no bearing on probable cause and therefore is not material.

ownership of 40 North Star changed several times between 2010 and 2014; that 40 North Star was

sold from Ledridge to Altamonte in 2014; that counsel for 40 North Star informed the FBI that Mr.

Wolfson owned Altamonte. These facts are material because if Mr. Kostin sold 40 North Star in

2014, then Mr. Wolfson's 2019 purchase was lawful, as he was not dealing in or purchasing blocked

property from a sanctioned person. The omitted context that Mr. Wolfson paid $12 million to

CapitalInvest in satisfaction of a 2014 loan is also material because the affidavit no longer asserts

that Mr. Wolfson paid Mr. Kostin, let alone for the property.

The corrected affidavit tells a story in which Mr. Kostin bought 40 North Star in 2010 and

sold it in 2014; later, in 2019, Mr. Wolfson directly purchased 40 North Star, paying $12 million on

behalf of an entity that he owned to a business apparently unrelated to Mr. Kostin. Because Mr.

Wolfson's 2019 purchase was not a purchase from Mr. Kostin, the affidavit's remaining facts are

insufficient to demonstrate a reasonable probability that Mr. Wolfson's and Mr. Bond's emails

would contain evidence pertaining to any sanctions violations. Probable cause "does not demand

'hard certainties,' but it does require more than a 'hunch[.]'" *Lauria*, 70 F.4th at 128. Here, the

untainted portions of the corrected affidavit do not surpass that hurdle.

The Court does not agree with the Government that, even with the corrections, the affidavit

still establishes probable cause. It is true that, before asserting facts about the Aspen Home, the

affidavit included facts about the superyacht scheme. For example, the affidavit asserts that based

on the FBI's investigation, "Kostin used and still uses shell companies and nominal owners to

obfuscate his true ownership of assets." Email Warrant ¶ 18. It adds, "Kostin purchases assets

through trusted associates, places the assets into the ownership of shell companies, and relies on his

trusted associates to manage and maintain the assets, which include superyachts and real property."

*Id.* However, that Mr. Kostin used shell companies in the superyacht scheme does not mean that

every company involved with the Aspen Home—like Altamonte—is also a shell company used by

Mr. Kostin.  Many wealthy people use pass-through entities to hold real estate; the use of such

vehicles is not unique to Mr. Kostin.  Additionally, the affidavit asserts no facts connecting Mr.

Wolfson and Mr. Bond to the superyacht scheme.  Moreover, the fact that Mr. Whyte and Mr.

Vassiliades were involved in the yacht scheme and facilitated the purchase of the Aspen Home in

2010 is irrelevant.  Mr. Kostin's purchase of the Aspen Home in 2010 was not criminal.  The

corrected affidavit does not include any fact suggesting that either Mr. Whyte or Mr. Vassiliades

remained involved with the Aspen Home after 2014.  Thus, because the remaining "untainted

portions" of the corrected affidavit do not support a finding of probable cause, suppression of the

fruits of the Email Warrant is required.

> **B. Mr. Wolfson's and Mr. Bond's Motions to Suppress the Fruits of the iCloud Warrant, the Wolfson Premises Warrant, and Cellphone Location Warrants Are Each Denied**

>> **1. The Alleged Misstatements Contained in the iCloud Warrant Are Immaterial**

After obtaining the Email Warrant, the Government refined its theory of probable cause.

Initially, the Government's primary—if not only—theory was that Mr. Wolfson violated IEEPA

when he purchased property from Mr. Kostin in 2019.  The later warrants, unlike the Email

Warrant, include a second theory.  Under the second theory, even if Mr. Wolfson did not purchase

the Aspen Home from Mr. Kostin in 2019, Mr. Wolfson's $12 million payment to CapitalInvest

violated IEEPA because Mr. Kostin controlled CapitalInvest.  The basis of this theory turns entirely

on facts supporting the conclusion that Mr. Kostin owned and controlled CapitalInvest.  It does not

rely on facts related to Mr. Kostin's ownership of the Aspen Home in 2019.  The second theory

therefore stands on its own.  Because the later-developed theory of probable cause does not rely on

proof of Mr. Kostin's ownership of the Aspen Home in 2019, it is unaffected by the misstatements

that the court found were damning to the Email Warrant.  The alternative theory of probable cause

is a pillar that supports each of the later warrants: the iCloud, Wolfson Premises, and Cellphone

Location Warrants. Because the misstatements contained in the Email Warrant only impeach the

earlier theory, each of the alleged misstatements is immaterial to the later warrants.

The iCloud Warrant affidavit—unlike the Email Warrant—describes Mr. Bond and

Mr. Wolfson's transfer of approximately $12 million to Mr. Kostin in September 2019 through shell

companies. The affidavit asserts that in September 2019, after sanctions were imposed, "Wolfson

wired $11.8 million to a Marshall Islands shell company named CapitalInvest." iCloud Warrant ¶ 45.

The grand jury records, documents, and interviews supported Special Agent Lockridge's belief that

"CapitalInvest is or was a shell company ultimately owned or controlled by Kostin." *Id.* ¶ 46. The

conclusion, the affidavit states, is based on "records obtained from witnesses and search warrant

returns," which indicated that CapitalInvest was a subsidiary in a line of shell companies—Gesford

Holdings Limited, Ionics Nominees Limited, and Atkien Enterprises—that Mr. Whyte partially

owned. *Id.* ¶ 46. The affidavit also asserts that "records obtained from a company that assists the

Marshall Islands with corporate registrations shows that the individual nominally identified as the

shareholder of CapitalInvest is the same person who was also listed as a nominal owner of other

assets owned by Kostin . . . ." *Id.* These assertions support a finding of probable cause that Mr.

Wolfson and Mr. Bond, "provided funds" for the benefit of a sanctioned person in violation of

IEEPA. *See id.* ¶ 47.

Mr. Bond takes issue with several misstatements contained in the iCloud Warrant, but each

impeaches the theory that Mr. Wolfson purchased the Aspen Home from Mr. Kostin in 2019.

None attack the theory that Mr. Wolfson violated IEEPA by sending money to Mr. Kostin through

CapitalInvest in 2019. Because the iCloud Warrant includes assertions that tie CapitalInvest to

Mr. Kostin, the alleged misstatements are immaterial. Mr. Bond has not made the requisite

"substantial preliminary" that "the allegedly false statement[s] [a]re necessary to the finding of

probable cause . . . ." *Lauria*, 70 F.4th at 124.  Mr. Bond's request for a *Franks* hearing and to suppress the fruits of the iCloud Warrant is denied.

### 2. The Motion to Suppress the Fruits of the Wolfson Premises Warrant is Denied

The Court denies Mr. Wolfson's motion to suppress the fruits of the Wolfson Premises Warrant because he did not make a substantial preliminary showing that the alleged misstatements in the affidavit are material.  The Wolfson Premises Warrant contains two pages of facts detailing the results of the Aspen Home investigation.  It asserts that Mr. Wolfson wired "approximately $12 million to a Marshall Islands shell entity controlled by Kostin, in violation of IEEPA."  *See* Wolfson Premises Warrant ¶¶ 19–25.  The affidavit also states:

> On February 20, 2024, a grand jury in the Southern District of New York returned sealed indictments charging WOLFSON with one count of conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705 (Count Three), and two counts of substantive violations of IEEPA (Counts Four and Five).  An arrest warrant was issued for WOLFSON's arrest.  A copy of an indictment and arrest warrant are attached hereto as Exhibit A and is incorporated into this affidavit by reference herein.

Wolfson Premises Warrant ¶ 26.

Mr. Wolfson argues that there are several misrepresentations in the assertions contained in the affidavit's two-pages of factual recitations.  First, Mr. Wolfson suggests that the affidavit falsely asserted the following:  "[I]n the period between 2010 and September 2019, Kostin remained, at all relevant times, the true beneficial owner of the Aspen Home."  Wolfson Omnibus Mem. at 9. Second, he objects to the omission of the fact that Mr. Kostin sold the property in 2014 to Altamonte, and that the FBI had evidence that Mr. Wolfson owned Altamonte.  Wolfson Omnibus Mem. at 9–11.  Mr. Wolfson argues it was misleading to omit these exculpatory facts but to include the inculpatory assertion that "artwork purchased by Kostin for the Aspen Home [was] transferred to Wolfson as part of the sale."  *Id.*  Finally, Wolfson argues that the statement, "[i]n September 2019, Wolfson purchased the Aspen Home by wiring approximately $12 million to a Marshall

Islands shell entity controlled by Kostin" is a misstatement because Mr. Wolfson purchased the Aspen Home in 2014.  Wolfson Reply at 27–28.

"[T]he existence of the [i]ndictment supports a finding of probable cause to believe a crime was committed."  *United States v. Pirk*, 292 F. Supp. 3d 584, 589 (W.D.N.Y. 2017) (holding in the context of a *Franks* challenge to a search warrant that, "while the affidavit did not simply rely on the charging by indictment of [the defendants] with various crimes," the incorporation of the indictment "supports a finding of probable cause to believe a crime was committed"); *see also United States v. Mouzon*, 2016 WL 7188150, at *4 (S.D.N.Y. Dec. 2, 2016) (judge issuing search warrant could have relied solely on facts in indictment to establish probable cause that defendant engaged in criminal activity); *United States v. Feng Ling Liu*, 2014 WL 101672, at *5 (S.D.N.Y. Jan. 10, 2014) (citing cases approving practice of relying on indictment to establish probable cause, although acknowledging that Second Circuit does not appear to have reached the issue).

Here, the incorporation and annexation of the indictment into the affidavit supports a finding that probable cause to believe that an IEEPA violation was committed.  *See* Wolfson Premises Warrant ¶¶ 26, 27.  Indeed, Mr. Wolfson does not address the fact that the Premises Warrant incorporates the indictment.  He is silent as to the role of the indictment in the probable cause determination by the magistrate.  He makes no argument that the Court should disregard the indictment, or second-guess the Grand Jury's probable cause determination.  Additionally, the affidavit devotes roughly three pages to facts that establish that evidence will be found in Mr. Wolfson's cell phone and his house.  *See* Wolfson Premises Warrant ¶¶ 27–35.  The affidavit therefore asserts sufficient facts to support the conclusion that, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found" in Mr. Wolfson's cell phone located inside his house.  *See Gates*, 462 U.S. at 238 (1983).

Even if the indictment did not independently provide probable cause for the crime, the affidavit did not simply rely on the indictment and instead included two additional pages of facts from the Aspen Home investigation. The affidavit asserts, for example, that Mr. Wolfson wired "approximately $12 million to a Marshall Islands shell entity controlled by Kostin, in violation of IEEPA." *See* Wolfson Premises Warrant ¶¶ 19–25. None of the alleged misstatements identified by Mr. Wolfson attack this assertion. Mr. Wolfson has therefore failed to make the requisite substantial preliminary showing required under *Franks*. Accordingly, Mr. Wolfson's motion to suppress the fruits of the Wolfson Premises Warrant is denied.

### 3. The Motion to Suppress the Fruits of the Cellphone Location Warrant is Denied

Finally, the Court denies Mr. Wolfson's request for a *Franks* hearing with respect to the Cellphone Location Warrant. The warrant incorporates the indictment and arrest warrant by reference, and attaches copies of both documents. Cellphone Location Warrant at USAO633 ¶ 8. As the basis for his challenge, Mr. Wolfson reiterates that "none of the contrary evidence" is disclosed." Wolfson Mem. at 11. He makes no mention of the indictment.

As already discussed, the fact that the Grand Jury had already returned an indictment charging Mr. Wolfson with engaging in IEEPA violations suffices to establish probable cause that the crime was committed. *See, e.g.*, *United States v. Windrix*, 405 F.3d 1146, 1153 (10th Cir. 2005) (concluding that because "[t]he affidavit incorporates the allegation in the original indictment . . . the grand-jury indictment provided probable cause"). Consequently, "the search warrant affidavit established probable cause to believe that a crime was committed" because of the indictment. *Pirk*, 292 F. Supp. 3d at 589–90. Even if the indictment did not independently provide probable cause, the affidavit incorporated the indictment's factual recitations for the Court to consider. *Cf. Feng Ling Liu*, 2014 WL 101672, at *5 ("[A] number of district courts in this circuit have considered the

allegations in indictments when evaluating magistrates' findings of probable cause."). Mr. Wolfson has not made a substantial preliminary showing that allegedly false or omitted statements are necessary to the finding of probable cause because the incorporated facts establish the Government's later developed theory of probable cause, namely that Mr. Wolfson's $12 million payment to CapitalInvest violated IEEPA because Mr. Kostin controlled CapitalInvest.

Additionally, "[t]he law is well established that probable cause to search a location for—or, in the case of CSLI, to demand—particular items or records is demonstrated where a totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found' thereby." *Lauria*, 70 F.4th at 128. Here, the affidavit asserts that the cell location information would identify and locate Mr. Wolfson and Mr. Bond and summarizes the basis for believing that they each used their cellphone, including returns from the iCloud Warrant. Cellphone Location Warrant at USAO633–643 ¶¶ 10–11. Because Mr. Wolfson has not met his burden under *Franks*, Mr. Wolfson's motion to suppress the fruits of the Cellphone Location Warrant is denied.

### C. Mr. Bond's Motion to Suppress Fruits of the Bond Cellphone Warrant is Denied

The Court denies Mr. Bond's motion to suppress the fruits of the Bond Cellphone Warrant because the remaining, untainted evidence asserted in the affidavit would provide a neutral magistrate with probable cause even after excising the tainted evidence from the Email Warrant. Unlike the other warrants, Mr. Bond does not seek suppression of the evidence obtained pursuant to the Bond Cellphone Warrant under *Franks*. Rather, he seeks suppression under the fruits of the poisonous tree doctrine. Bond Mem. 20–21. Mr. Bond summarily argues in a single paragraph that the Bond Cellphone "Warrant's probable cause attestations were based, in large part, on evidence that appears to have been seized pursuant to the [Email] and [iCloud] Warrants." *Id.* Bond argues that, "[t]o the extent that the evidence supporting probable cause to search the phone was derived

from the unlawful searches of Bond's Yahoo, Gmail, and Apple accounts, anything seized from the phone is also subject to exclusion." *Id.* Not so.

"[I]t is well established that '[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.'" *United States v. Peeples*, 962 F.3d 677, 688–89 (2d Cir. 2020) (citing *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)) ("Even if we were to excise [the defendant's] post-arrest statements [that should have been suppressed] from the affidavits in support of the application for the search warrant . . . , there is ample untainted evidence in the affidavits supporting the magistrate judge's probable cause finding."). "In those circumstances, '[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant[.]'" *Id.*

The Court has no problem concluding that the Bond Cellphone affidavit, excised of the tainted evidence, provided probable cause to issue a warrant to search Mr. Bond's phone. First, the affidavit incorporates the indictment and Mr. Bond's arrest warrant. Bond Cellphone Warrant ¶ 8 & Exhibit A. As already described, that alone provides probable cause to believe that an IEEPA violation was committed. Additionally, the warrant affidavit recites facts that establish probable cause to believe that Mr. Bond's phone contained evidence and would be found inside his residence. For example, the FBI knew, based on evidence from the iCloud Warrant and witness interviews, that Mr. Bond used a phone ending in -9185. *Id.* ¶ 20(a)-(b). Cell site location data indicated that the phone associated with his number was near the New Jersey house. *Id.* ¶ 20(f). The affidavit recounts that Mr. Bond reportedly used his phone in connection with the Aspen Home based on "grand jury records, email communications, and interviews with witnesses." *Id.* ¶ 25(a). Setting aside any evidence obtained from the Email Warrant, the affidavit includes independent sources for the assertion that Mr. Bond's phone contained evidence of a crime. The affidavit also explains:

"Like individuals engaged in any other kind of activity, individuals who engage in conspiracy to violate IEEPA and substantive violations of IEEPA store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as Bond's cellular device." *Id.* ¶ 26. Indeed, of the nearly forty paragraphs of facts asserted in the affidavit, Mr. Bond claims that only two are tainted.[32] Because the untainted evidence asserted in the affidavit would provide a neutral magistrate with probable cause, Bond's motion to suppress the fruits of the Bond Cellphone Warrant is denied.

### D. Mr. Wolfson's Motion to Suppress His Statement and the Contents of His Devices is Denied

#### 1. Only the Passcode Statement Must Be Suppressed under *Miranda*

The conceded violation of Mr. Wolfson's *Miranda* rights does not support the exclusion of evidence obtained using the content of the statement. It is well settled that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion) (discussing *Miranda v. Arizona*, 384 U.S. 436 (1966)). "[A] mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *Id.* at 641. "It follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*." *Id.* "Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Id.* "And, at that point, '[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation." *Id.* at 641–642. "Thus, unlike unreasonable searches under the Fourth

---

[32] Mr. Bond cites two additional paragraphs that convey information obtained pursuant to the iCloud Warrant. Bond Cellphone Warrant ¶ 20(a)("Search warrant returns for associated with Bond's Apple ID account revealed that in November 2023, BOND was using the number ending in 9185 to message another individual about moving to Edgewater, New Jersey."); *id.* ¶ 20(c)("Apple iCloud search warrant returns list an email account known to belong to Bond . . . ."). Because the Court does not suppress the fruits of the iCloud Warrant, those paragraphs are not relevant.

Amendment or actual violations of the Due Process Clause or the Self-Incrimination Clause, there is, with respect to mere failures to warn, nothing to deter." *Id.* "There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine . . . ." *Id.*

There is no doubt that a *Miranda* violation occurred in this case. The Government concedes as much. Opp. at 26. This concession is well-placed. Mr. Wolfson was subject to custodial interrogation when he was handcuffed in the back of the law enforcement vehicle, and Special Agent Chattaway asked him for his passcode without completing the required warnings. Mr. Wolfson's statement was therefore "elicited by the police during a custodial interrogation," such that *Miranda* warnings were required. *See United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017). Mr. Wolfson did not receive *Miranda* warnings, however. The Court has no trouble concluding that a *Miranda* violation occurred.

The remedy for the *Miranda* violation, however, is suppression of the contents of the statement only. "[T]he exclusion of unwarned statements"—here, the passcode—"is a complete and sufficient remedy" for the *Miranda* violation. *Patane,* 542 U.S. at 643. Given the prophylactic nature of *Miranda,* the exclusion of evidence obtained using the content of the statement—the device's contents—is not an available remedy for the *Miranda* violation because the "fruit of the poisonous tree doctrine" does not apply to mere failures to warn. *Id.* at 642.

It does not matter that the "fruits" here are electronic data, rather than a physical object, as Mr. Wolfson contends. *See* Miranda Mem. at 10. In support of his argument, Mr. Wolfson relies on the logic of *Riley v. California* to argue that "*Patane* does not apply in the context of digital devices because 'a cell phone is not just a physical object containing information'" but is instead "more personal than a purse or a wallet . . . ." *Id.* "In *Riley v. California*, the Supreme Court considered the authority of the police to conduct a search of a person's cell phone when seized incident to the

arrest of the person." *United States v. Smith*, 967 F.3d 198, 207–08 (2d Cir. 2020) (internal citations omitted). As the Second Circuit has summarized:

> [T]he prevailing rule was that the police could conduct a search of ordinary personal effects that were found on an arrestee's person without the need to apply for a search warrant. But the Court observed that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." The Court went on to describe the immense storage capacity of modern cell phones and how people commonly use them to store vast amounts of highly personal information.
>
> All these extraordinary characteristics led the Supreme Court to conclude that "[o]ur answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant. The same rule has been applied to the search of cell phones seized under other exceptions to the Fourth Amendment's warrant requirement [including the "plain view" and "automobile" exceptions].

*Id.* (internal citations omitted); *see also United States v. Jones*, 43 F.4th 94, 108 (2d Cir. 2022) (quoting *Riley*, 573 U.S. at 382 (2014)) ("When the police undertake a search 'to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant.'").

Here, Mr. Wolfson's rights under the Fourth Amendment are protected because the Government had a warrant to search Mr. Wolfson's phone and, as already described, his rights under *Miranda* are safeguarded by suppression of the statement. *Riley* addressed the reasonableness of a warrantless search of a cellphone incident to arrest under the Fourth Amendment. *Riley*, 573 U.S. at 382 ("The two cases before us concern the reasonableness of a warrantless search incident to a lawful arrest."). It did not discuss the propriety of suppressing fruits obtained from an un-*Mirandized* statement; that was *Patane,* 542 U.S. at 642. The remedy for the violation of Mr. Wolfson's rights under *Miranda* is suppression of his statement only; this is "a complete and sufficient remedy." *See Patane,* 542 U.S. at 643. Mr. Wolfson's motion to suppress the contents of his devices because they are fruits of his un-*Mirandized* statement is denied on those grounds.

### 2. Mr. Wolfson's Statement Was Voluntary

The Government may use evidence derived from Mr. Wolfson's statement providing Special Agent Chattaway his passcode because his statement was made voluntarily. The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. "[T]he Self–Incrimination Clause contains its own exclusionary rule," which is "self-executing." *Patane*, 542 U.S. at 640. "[The Supreme Court has] repeatedly explained 'that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'" *Id.* (emphasis in original). The Court must therefore determine whether Mr. Wolfson's statement was voluntary.

Statements are voluntary when they are "the 'product of an essentially free and unconstrained choice by [their] maker.'" *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (alteration in original) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "'[C]oercive police activity' is a 'necessary predicate' to holding a confession constitutionally involuntary." *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). However, police conduct that is "'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *Id.* (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)). Rather, a court must make "specific findings . . . that under the totality of the circumstances . . . the defendant's will was overborne by the [police] conduct." *Id.* (alterations in original) (quoting *Anderson*, 929 F.2d at 99). "Such circumstances generally fall into 'three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" *Id.* (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988)). Among the characteristics of the defendant that courts often consider are the defendant's background,

education, maturity level, familiarity with the law, and intelligence. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995).

"[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). "Accordingly, courts place upon the government the burden to prove that a defendant's confession was voluntary." *Id.*

In this case, there is no question that Mr. Wolfson's statement was made voluntarily. In making this determination, the Court is guided by the factors outlined in *Scully*, 850 F.2d at 901-02. First, the Court considers the "[t]he relevant characteristics of the individual who confessed [which] are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." *Scully*, 850 F.2d at 901–02; *accord United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012), *as amended* (Nov. 15, 2012). Here, Mr. Wolfson was a grown, educated adult. Tr. 217:4-8. Mr. Wolfson was an accomplished, smart, and highly successful banker and businessman. *Id.* He could speak English well; Mr. Wolfson did not use an interpreter at the hearing. Tr. 217:11-12. Mr. Wolfson's personal characteristics therefore support a finding of voluntariness.

Second, the conditions of the questioning support a finding of voluntariness. The "conditions under which a suspect is questioned, includes the place where an interrogation is held, and the length of detention." *Scully*, 850 F.2d at 901–02. Here, the questioning occurred outside of Mr. Wolfson's home. GX 19. His family was nearby. Although seated in the law enforcement vehicle in handcuffs, the door of the car remained open. *Id.* The entire interaction lasted only a few minutes. *Compare United States v. Mendonca*, 88 F.4th 144, 163–64 (2d Cir. 2023) (citing *Haynes v.*

*Washington*, 373 U.S. 503, 504 n.1 (1963) (holding that a confession was involuntary based on police conduct when the defendant was held incommunicado for days after his arrest))).

Finally, the conduct of the law enforcement officials does not support a finding of involuntariness. "Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights; whether there was physical mistreatment such as beatings; or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep; or even of clothing for a prolonged period." *Scully*, 850 F.2d at 902 (internal citations omitted) (citing *Bram v. United States*, 168 U.S. 532, 561 (1897) (suspect was taken to police detective's office and there "he was stripped of his clothing")). "In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." *Scully*, 850 F.2d at 902. Here, Special Agent Chattaway spoke calmly. Although Mr. Wolfson was handcuffed in an uncomfortable position, Special Agent Chattaway took care to "explain to [Mr. Wolfson] the process of what is going to happen" and attempted to reassure Mr. Wolfson by stating "let's get you to the next destination and we will get you in a more comfortable position." Tr. 202:14-23. Mr. Wolfson was also provided with rather than stripped of clothing, as in *Bram*, 168 U.S. at 561. There are no allegations of abuse. Special Agent Chattaway and Mr. Wolfson were both calm. The Court concludes that the statement was, therefore, "the product of a free and deliberate choice" to respond to the agent, "rather than intimidation, coercion, or deception." *Mendonca*, 88 F.4th at 163. The Court has no trouble concluding that Mr. Wolfson's will was not overborne when he provided his passcode.

The Court does not agree with Mr. Wolfson that Special Agent Chattaway engaged in misconduct that rendered the statement involuntary. Mr. Wolfson argued in his motion and at the hearing that Special Agent Chattaway acted with bad faith because he mistakenly believed that he

56

could ask Mr. Wolfson for his passcode, even though the warrant expressly stated he did not have such authority. *See* Wolfson Reply at 7–9. At the outset, the Court does not find that Special Agent Chattaway acted in bad faith or intentionally violated *Miranda*. Special Agent Chattaway testified credibly that he honestly but mistakenly believed that he was lawfully allowed to ask for the passcode as a part of his pedigree information. Second, Mr. Wolfson's argument that bad faith "tainted" the search is inapplicable here. Mr. Wolfson cites *Missouri v. Seibert*, 542 U.S.600, 616–17 (2004), a case that requires courts to "address whether the officers employed a 'deliberate, two-step strategy predicated upon violating *Miranda* during an extended interview . . .'" in which officers intentionally violate *Miranda* in the first interview, then provide *Miranda* warnings and re-ask the questions. *Capers*, 627 F.3d at 477 (quoting *Seibert*, 542 U.S. at 621). This situation is inapplicable here. While Special Agent Chattaway violated the *Miranda* rule when he obtained the passcode, and subsequently administered the warnings, there is no indication that Agent Chattaway then re-asked the question seeking his passcode, nor does the government make this argument. Accordingly, based on the totality of the circumstances, the Court concludes that Mr. Wolfson's statement was voluntary.[33]

### E. The Motion to Suppress Allegedly Privileged Information is Denied Without Prejudice

Mr. Wolfson's motion to suppress allegedly privileged documents is denied without prejudice. Mr. Wolfson seeks suppression at trial of potentially privileged communications contained in 16,000 pages of documents that were voluntarily produced to the Government by his former Cyprus-based lawyer. *See* Privilege Mem. at 1 ("The fruits of these plain violations of the

---

[33] Because the Court concludes that Mr. Wolfson's statement was voluntary, the Court need not address the Government's alternative argument that suppression of the fruits of Mr. Wolfson's statement is not warranted under the doctrine of inevitable discovery. *See* Opp. at 22–23.

attorney-client privilege must be suppressed").  To "effectuate suppression," he asks that the Court

order the return of the documents.  *Id.* at 10.  Alternatively, he proposes that "all files produced by

the Firm should be required to go through filter team review."  *Id.* at 11.  Because the Court cannot

determine whether all 16,000 documents are privileged absent a document-by-document review, the

motion is denied.  However, as the Court indicated at the March 12, 2025 hearing, Mr. Wolfson may

renew his arguments on a document-by-document basis with respect to any communications that

the Government intends to introduce or rely on at trial.

      "The underlying purpose of the attorney-client privilege is 'to encourage full and frank

communication between attorneys and their clients.'"  *United States v. Krug*, 868 F.3d 82, 86 (2d Cir.

2017).  "As a result, the attorney-client privilege creates a rule of confidentiality that 'recognizes that

sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon

the lawyer's being fully informed by the client.'"  *Id.*; *see also United States v. Schwimmer*,

892 F.2d 237, 243 (2d Cir. 1989) ("*Schwimmer I*") ("[T]he rule affording confidentiality to

communications between attorney and client endures as the oldest rule of privilege known to the

common law" and "provides essential support for the constitutional right to the assistance of

counsel."); Fed. R. Evid. 501 (providing that "[t]he common law—as interpreted by United States

courts in the light of reason and experience—governs a claim of privilege" unless the Constitution,

federal statute, or rules prescribed by the Supreme Court provide otherwise).

      The protection afforded by the attorney-client privilege "applies 'regardless of the manner in

which it is sought to put the communications in evidence, whether by direct examination, cross-

examination, or indirectly as by bringing out facts brought to knowledge solely by reason of a

confidential communication.'"  *Schwimmer I*, 892 F.2d at 244 (internal quotation marks omitted)

(remanding for a hearing to determine whether the government improperly invaded the

attorney-client privilege).  "[The Second Circuit has] held that the mere 'tangential[ ] influence[ ]

[that privileged information may have on] the prosecutor's thought processes in . . . preparing for trial' was not an unconstitutional use." *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991) ("*Schwimmer II*") (alterations in original) (citing *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988)); *cf. United States v. Correia*, 468 F. Supp. 3d 618, 620–21 (S.D.N.Y. 2020) (explaining that while "communications about preexisting documents are 'privileged from disclosure by testimony in court,' this principle has no bearing on whether the Government could obtain the preexisting documents themselves via a search warrant.") (internal citations omitted).

Generally, "[a] party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). "[W]here, as here, alleged privileged communications took place in a foreign country or involved foreign attorneys or proceedings, this court defers to the law of the country that has the 'predominant' or 'the most direct and compelling interest' in whether those communications should remain confidential, unless that foreign law is contrary to the public policy of this forum." *Guiffre v. Maxwell*, 2016 WL 1756918, at *4 (S.D.N.Y. May 2, 2016).

Mr. Wolfson's motion to suppress—or for the Government to return—all 16,000 pages of potentially privileged communications is both impracticable and inappropriate. First, to determine whether a document is privileged, the Court needs to review that particular communication. "[I]t is not possible at this juncture to determine the applicability of the privilege, as the Court does not know what documents will be introduced, and the parties have not briefed the issue on a document-by-document basis." *United States v. Schulte*, 2019 WL 5287994, at *1, *4 (S.D.N.Y. Oct. 18, 2019) (addressing the attorney-client privilege when the defendant "move[d] to suppress all document evidence seized from his cell"). Here, the Government has raised a number of potential issues with respect to the privilege claim, including that some documents pre-dated any attorney-client

relationship, or did not pertain to legal advice. The parties also have not briefed the issue of which jurisdiction's privilege laws should apply with respect to each document. The Court cannot resolve these issues without document-by-document briefing. *See* Opp. at 13-21; *see generally In re Cnty. of Erie*, 473 F.3d at 420 (explaining that whether a lawyer provided legal advice such that the attorney-client privilege applies "is not demarcated by a bright line."). Indeed, Mr. Wolfson "expressly acknowledge[s]" that "the documents will need to be reviewed individually in order to make document-specific privilege claims." Wolfson Reply at 26. This acknowledgment is well placed.

Second, even if some documents are privileged, the remedy for any potential violation of the attorney-client privilege in this case is preclusion from use at trial. *See United States v. Landji*, 2021 WL 5402288, at *27 (S.D.N.Y. Nov. 18, 2021) (denying a request to return potentially privileged documents seized by the government, explaining that "this Circuit has not endorsed the taint theory . . . that 'the [G]overnment's thought process or questioning of witnesses may have been influenced by [its access to Defendants' Documents].'"); *see also United States v. Combs*, 2025 WL 485377, at *3 (S.D.N.Y. Feb. 12, 2025) (explaining that the defendant could "flag suspect evidence" that potentially violated his attorney-client privilege "if the Government later attempts to use it against [the defendant] at trial."); *Schulte*, 2019 WL 5287994, at *4 ("[I]f the Government intends to or seeks to introduce privileged documents at trial, then the Defendant can move to suppress any allegedly privileged documents."); *United States v. Giovanelli*, 747 F. Supp. 891, 894 (S.D.N.Y. 1989) (concluding that the "if the Government seeks to introduce [potentially privileged] statements at trial, the court will determine at the proper time whether those statements may be correctly received in evidence."). Accordingly, as the Court described at the March hearing, Mr. Wolfson may raise arguments *in limine* on a document-by document basis with respect to specific communications that the government intends to use at trial. Mr. Wolfson's motion to suppress the potentially privileged communications in their entirety, at this juncture, is denied.

60

### F.  Defendants' Request for a Bill of Particulars is Denied

The request by Mr. Wolfson and Mr. Bond for a bill of particulars is denied.  Mr. Wolfson asks the Court to order the Government to provide a bill of particulars "to enumerate the factual basis" and "identify the documentary and testimonial evidence it intends to introduce at trial" related to the nominees owned and controlled by CapitalInvest.  *See* Wolfson Omnibus Mem. at 6.  He also seeks a bill of particulars with respect to "[t]he claim that Capital Business Finance," the alleged parent company of CapitalInvest, 'regularly funded the bank account used by Altamonte."  *Id.*  He argues that a bill of particulars is needed because the Government has "refused to answer reasonable and specific questions" with respect to these claims.  *Id.*

No bill of particulars is warranted here.  The indictment and the Government's disclosures contain sufficient information for Mr. Wolfson and Mr. Bond to prepare their defense and avoid prejudicial surprise at the trial.  Mr. Wolfson and Mr. Bond are requesting a preview of the Government's proof at trial, which is not the proper purpose for a bill of particulars.

Federal Rule of Criminal Procedure 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [a] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  "A bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal citations omitted).  It is not "a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Tuzman*, 2017 WL 4785459, at *13 (S.D.N.Y. Oct. 19, 2017) (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)).

"Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." *Tuzman*, 2017 WL 4785459, at *13 (quoting *United States v. Gotti,* 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004)). "The function of a bill of particulars is to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010) (quoting 1 C. Wright, Federal Practice and Procedure § 129, at 434–35 (2d ed. 1982)).

"[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Walsh*, 194 F.3d at 47. "Generally, if the information sought by [a] defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574. "In considering whether a bill of particulars is required, the Court considers not only the information provided in the indictment, but also discovery materials and other information provided to the defendant." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018). Ultimately, "[w]hether to grant a bill of particulars is generally a decision entrusted to the sound discretion of the district court." *United States v. Ramirez*, 609 F.3d 495, 502 (2d Cir. 2010).

The Court denies Mr. Wolfson's request for a bill of particulars because the indictment and the Government's disclosures contain sufficient information for Mr. Wolfson and Mr. Bond to prepare their defense and avoid prejudicial surprise at the trial. First, the indictment's charges are not "so general that they do not advise the defendant of the specific acts of which he is accused." *See Walsh*, 194 F.3d at 47. Here, the 21-page speaking indictment identifies in detail the nature of the allegations: that Mr. Wolfson, with Mr. Bond's help, allegedly violated IEEPA by transferring $12 million to Mr. Kostin through various shell companies. The indictment names the

specific entities through which the alleged nominees and Mr. Kostin allegedly used to exercise control of the Aspen Home. *See* S2 ¶ 45 ("Capital Business Finance's shares are held by a nominal shareholder in trust for a shell company called Gesford Holdings, which is in turn owned by Atkien Enterprises, as a nominee for CC-1, and Ionic Nominees Limited, as a nominee for CC-3."). The details contained in the indictment therefore permit Mr. Wolfson and Mr. Bond to investigate the specific entities allegedly involved. The indictment also details the 2019 transaction. It occurred on September 25, 2019. It involved a $11.8 million payment from Mr. Wolfson's Cyprus-based bank account. The recipient of the funds was Capital Business Finance. It corresponded with a $200,000 transfer from Altamonte to CapitalInvest. *See id.* ¶ 48. The indictment apprises Mr. Wolfson and Mr. Bond of charges such that they may build a defense. A bill of particulars is therefore not "necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial." *Torres*, 901 F.2d at 234.

Second, the Government has provided the defense substantial discovery materials. The parties have also agreed to disclose pre-trial materials far in advance of trial. These materials provide the defense substantial information about the basis for the Government's charges against the defendant. These materials, too, reduce any need for the issuance of a bill of particulars in this case.

Third, the Government is not required to "identify the documentary and testimonial evidence it intends to introduce at trial" related to the "purported 'nominee' relationship between CC-3 and Mr. Kostin." *See* Wolfson Omnibus Mem. at 6. Indeed, "a bill of particulars should not be ordered to force the Government to 'particularize all of its evidence.'" *See United States v. Castillero*, 2024 WL 4815672, at *3 (S.D.N.Y. Nov. 18, 2024) (quoting *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991)). Mr. Wolfson argues that a bill of particulars is needed because the Government has "refused to answer reasonable and specific questions" with respect to these allegations. *See* Wolfson Omnibus Mem. at 6. But a bill of particulars is not "a general investigative

tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *Tuzman*, 2017 WL 4785459, at *13. "Acquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234. The Government has already produced search warrant affidavits, "corporate and financial records that show the nominee structures Kostin used to hold and manage his assets and how the alleged nominees regularly acted as Mr. Kostin's agents with respect to those entities and assets." *See* Opp. at 66. As already mentioned, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence . . . ." *Walsh*, 194 F.3d at 47; *see also United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("The Indictment, coupled with the discovery information thus far provided to defendants, sufficiently advises [the defendant] of the crime charged and the general outline of the government's case against him."). Because the indictment and the Government's disclosures contain sufficient information for Mr. Wolfson and Mr. Bond to prepare their defense and avoid prejudicial surprise at the trial, a bill of particulars is not necessary in this case. Mr. Wolfson's request for a bill of particulars is denied.

### G. Mr. Wolfson's Request for Grand Jury Materials is Denied

Mr. Wolfson's request for the grand jury minutes is denied because he has not demonstrated a particularized need that outweighs the substantial interest in the secrecy of grand jury proceedings. "There is a tradition in the United States . . . that proceedings before a grand jury shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997). Following this tradition, Federal Rule of Criminal Procedure 6(e) provides that "[u]nless these rules provide otherwise," participants in the grand jury "must not disclose a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). "The secrecy is not absolute." *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978). The rule permits a court to "authorize disclosure" in certain circumstances including "at the request of a defendant who shows that a ground may exist to dismiss the indictment because

of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). "[T]he burden is on the party seeking disclosure to show a 'particularized need' that outweighs the need for secrecy." *Moten*, 582 F.2d at 662; *see also United States v. Helbrans*, 547 F. Supp. 3d 409, 434 (S.D.N.Y. 2021) ("'[A] defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity' that outweighs the Government's and the Grand Jury's substantial interest in secrecy.").

Additionally, "a presumption of regularity attaches to grand jury proceedings . . . ." *See United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994); *see also United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.") (internal quotation marks omitted). "Breaking grand jury secrecy constitutes extraordinary relief." *Helbrans*, 547 F. Supp. 3d at 434. "[A] defendant seeking the disclosure of grand jury materials bears a heavy burden." *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (summary order). It is also settled that "[a] review of grand jury minutes should not be permitted without concrete allegations of Government misconduct." *Leung*, 40 F.3d at 582.

In this case, Mr. Wolfson has failed to meet his heavy burden to show a particularized need for disclosure that outweighs the need for secrecy. Mr. Wolfson argues that "[t]he apparent lack of evidence and the government's evasive answers when pressed suggest that the grand jury may have been deceived or misled as to key legal or factual issues." Wolfson Omnibus Mem. at 15. This argument is "unduly speculative . . . ." *See Helbrans*, 547 F. Supp. 3d at 434–35 (denying a request for grand jury materials based on claims that certain prejudicial information "'may' have been presented to the Grand Jury" and that "the Grand Jury may not have been properly instructed as to the elements of a parental kidnapping conspiracy."). Mr. Wolfson "presents no tangible basis to conclude that any of [the] alleged impropriety occurred." *Id.* Rather, his argument is that because

he views the evidence as insufficient, there must have been some unspecified misconduct that led the grand jury to indict. This speculative argument is insufficient to overcome the "presumption of regularity [that] attaches to grand jury proceedings . . . ." *See Leung*, 40 F.3d at 581; *see also United States v. Hunt*, 2006 WL 2613754, at *10 (S.D.N.Y. Sept. 6, 2006) ("[S]peculation and surmise regarding what transpired before the grand jury is not sufficient to overcome that presumption of regularity") (internal quotations omitted) (collecting cases).

Mr. Wolfson's contention that the Government should have, but may not have, explained their potential lack of direct evidence with respect to Mr. Kostin's benefit is also unpersuasive because the Government need not present exculpatory evidence. *See Kaley v. United States*, 571 U.S. 320, 338 (2014) (explaining that, with respect to "a grand jury's finding of probable cause," it "is and 'has always been thought sufficient to hear only the prosecutor's side,'" noting "for example, [that the Supreme Court has] declined to require the presentation of exculpatory evidence[.]") (internal citations omitted)). Mr. Wolfson has therefore failed to establish that his need for the grand jury materials outweighs the need for secrecy. His request for the grand jury minutes, or for the Court to conduct an *in-camera* review of those minutes is denied.

**IV.      CONCLUSION**

For the foregoing reasons, Mr. Wolfson's and Mr. Bond's motions to suppress are

GRANTED in part and DENIED in part.  Mr. Wolfson's and Mr. Bond's motion to suppress the

fruits of the Email Warrant is GRANTED.  Mr. Wolfson's motion to suppress allegedly privileged

documents is DENIED WITHOUT PREJUDICE.  In all other respects, Mr. Wolfson's and Mr.

Bond's motions are DENIED.  The Clerk of Court is directed to terminate the motions pending at

Dkt. Nos. 74, 77, 81, 84, 86, and 129.

SO ORDERED.

Dated:  May 21, 2025
        New York, New York

_____
GREGORY N. WOODS
United States District Judge